CARBIDE & CARBON CHEMICALS CORP. *v.* CARSON, Commissioner of Finance and Taxation.

ROANE-ANDERSON CO. *v.* CARSON, Commissioner of Finance and Taxation.

DIAMOND COAL MINING CO. *et al. v.* CARSON, Commissioner of Finance and Taxation.

WILSON-WEESNER-WILKINSON CO. *et al. v.* CARSON, Commissioner of Finance and Taxation.

(*Nashville,* December Term, 1950.)

Opinion filed March 9, 1951.

(Petitions for Certiorari granted by Supreme Court of United States Oct. 15, 1951)

152

S. Frank Fowler, of Knoxville, T. L. Caudle, Ellis N. Slack, Berryman Green, Joseph Volpe, Jr., Bennett Boskey, and Harold L. Price, all of Washington, D. C., J. Wallace Ould, Jr., of Oak Ridge, Tennessee, for appellants.

Roy H. Beeler, Attorney General, William F. Barry, Solicitor General, and Allison B. Humphreys, Jr., Advocate General, for appellees.

Mr. Justice Burnett delivered the opinion of the Court.

The question for our decision in these consolidated cases is whether or not the appellants are liable for Sales taxes and Use taxes as applied by Chapter 3 of the Public Acts of 1947 as amended, Retail Sales Tax Statute.

Both of these taxes are privilege taxes and

they have been defined by this Court as: "The Sales Tax imposes upon the seller a tax for the privilege of selling tangible personal property and is required to be paid by the seller. *Hooten* v. *Carson,* 186 Tenn. 282, 283, 209 S. W. (2d) 273. The Use Tax is a tax upon the privilege of using, consuming, distributing or storing tangible personal property after it is brought into this State from without this State". *Madison Suburban Utility District* v. *Carson,* 191 Tenn. 300, 232 S. W. (2d) 277, 280.

The present suits were brought as test cases. During the fall of 1947, the appellants paid under protest a sum of money slightly in excess of $5000 to the Commissioner of Finance and Taxation, and brought suit, as provided by Tennessee Code, Section 1790 et seq., to recover such taxes. It was said in argument that about two million dollars is eventually involved. After suits were instituted and during the progress of the trial the United States government petitioned to and was allowed to intervene as an Intervenor herein. The position taken by the United States Government is identical in all respects with that of the appellants named above. It was stipulated during the progress of the trial that since the suits were instituted the Commissioner of Finance and Taxation was then James Clarence Evans and the suits were revived as to him.

The Chancellor held that the taxes were properly collected by the Commissioner of Finance and Taxation and accordingly dismissed the suits. These suits have been consolidated, were argued together, and it was agreed that we could render one opinion applicable to all, as the questions raised were identical. These suits involve a typical transaction between the contractors and the vendors wherein the question of whether or not this Tennes-

see Sales tax and Use tax are applicable under the factual situation as very thoroughly developed in this large record.

There are numerous assignments of error. As a whole, though, these assignments go to the finding or the failure of the Chancellor to find facts according to the contention of the appellants. There are two contentions made by the appellants, both of which were answered contrary to their contention by the Chancellor, either of which if answered in the affirmative would sustain the suits in these cases. These contentions are: (1) that the Tennessee Sales Tax Statute as applied to purchases and procurements herein is invalid and an infringement of the Federal Constitutional immunity of the means and instrumentalities employed by the United States to carry on its functions and (2) that if there is no implied Federal Constitutional immunity under the facts developed in this case, that then under the terms of Section 9(b) of the Atomic Energy Act, 42 U. S. C. A. Section 1809(b), creating this Federal agency, that Congress has exempted the property, income, and activities of the Commission from State or local taxation "in any manner or form".

Why these contentions?

Prior to our entering World War II in December, 1941, scientists were convinced that an atomic weapon could be made. These scientists with a group of others convinced the President of the United States and his advisers that this could be done. Accordingly the President appointed a committee who in turn further convinced him of the possibilities of such a weapon, and from this the government began the development of facilities to develop such a weapon. It was necessary in the development of atomic energy that great secrecy be kept; that the proceedings

toward development of such energy be greatly separated, for security reasons and for reasons of health and safety of the people of the United States, because "probably the largest calculated risk anyone ever took" (Smyth Report) was being undertaken. Thus rather isolated large areas of land were acquired in different sections of the United States, such as approximately 59,000 acres in Anderson and Roane Counties, Tennessee, on the Clinch River; Hanford, Washington, on the Columbia River and Los Alamos, New Mexico. Other places for research were acquired and used near the University of Chicago, etc.

As a part of this effort, the government in September, 1942, began to develop the Clinton Engineering Works, commonly called Oak Ridge, which was a unit of the Manhattan District established under the War Powers Act on executive orders of the President of the United States to carry on this research and development of the atomic bomb. The Manhattan District was under the direction of the United States Army Corps of Engineers; and the bomb was the immediate objective.

"A weapon has been developed that is potentially destructive beyond the wildest nightmares of the imagination; a weapon so ideally suited to sudden unannounced attack that a country's major cities might be destroyed overnight by an ostensibly friendly power. This weapon has been created not by the devilish inspiration of some warped genius but by the arduous labor of thousands of normal men and women working for the safety of their country." Smyth Report, Page 163, released in August, 1945.

Because of the enormity of the problem that was involved and the fact that no individual or corporation had had any experience in this particular kind of a field it

was necessary for the Army Engineers to employ various and sundry large corporations of America who had the "know-how" in various and sundry scientific fields and other fields which were necessarily involved in the development of Atomic energy. Consequently the government entered into cost-plus-fixed-fee contracts with these corporations. To mention a few are: Carbon & Carbide Chemical Corporation; Monsanto Chemical Corporation; General Electric Corporation; DuPont Company and many others. It soon developed that it would be necessary to construct housing facilities for the workers and employees and key personnel of these various companies who were to operate these enormous plants. For instance, at Clinton, Tennessee, an entire new city of some forty or fifty thousand people grew up almost over night. To operate this City for these people all of the facilities for a modern city were needed. The Army did not possess the "know-how" to develop such a city but they had had experience with a construction company in New York who knew how to do such a thing, consequently, this construction company was contacted and they in turn formed the Roane-Anderson Company, a Tennessee corporation for the purpose of operating the Town of Oak Ridge. Roane-Anderson entered into a cost-plus-fixed-fee contract with the Army for this work. The Carbon & Carbide Chemical Corporation entered into a like contract with the government to operate certain plants at Oak Ridge.

This development under the Army Corps of Engineers was of course designed to achieve the maximum military result which it did as all of us now know. In the development of nuclear energy it became apparent to those connected with this development that it would be necessary for the government to maintain some sort of con-

trol in this field after the war. As a result of this feeling recommendations were made to the Congress of the United States who after a full debate passed an Act for the development and control of Atomic energy, August 1, 1946. This complete Act is carried in 42 U. S. C. A., Sections 1801 through 1819. By this Act the Atomic Energy Commission was created and they constitute a committee having a governmental monopoly in this field of Atomic energy. This Act among other things declares that ''the development and utilization of atomic energy shall, so far as practicable, be directed toward improving the public welfare, increasing the standard of living, strengthening free competition in private enterprise, and promoting world peace.''

The Atomic Energy Commission, having a right to do so under the Act, saw that their duties were so gigantic and complicated technically that it would be impossible for any one company to handle their undertakings. Accordingly the Commission has entered into various and sundry cost-plus-fixed-fee contracts with various and sundry contractors who possess the ''know-how'' in their respective fields. The Commission in this way either directly or through these contractors, carries on a wide and extensive program for the United States government in the field of Atomic energy, including the production of materials for Atomic weapons, and the production of radioactive materials for the use and research and development activities relating to Atomic energy. The plants selected and established by the Army Corps of Engineers have been continued. The land and all facilities in the plant at Oak Ridge are wholly owned by the United States government.

The principal contractor of the Commission in Oak Ridge for the operation of its plants there, is the appel-

lant Carbide & Carbon Chemical Corporation, (hereinafter for short referred to as Carbide). The Town management contractor for the Town of Oak Ridge is the appellant Roane-Anderson Company (hereinafter referred to as Roane-Anderson). Carbide operates the production facilities at Oak Ridge and these concentrate on the production of Uranium-235, a fissionable material, over which the Commission is given by the Act a monopoly. Carbide also operates various and sundry other plants there. Carbide also operates at present the Oak Ridge National Laboratory, a laboratory for Atomic energy research. In the laboratories, research of fundamental importance to production and use of fissionable material is carried on and radioactive isotopes which are proving an enormous benefit to medical, biological, agricultural, and industrial research of all kinds are produced and distributed.

The Town of Oak Ridge, as heretofore said, is located on Commission owned site and exists for the sole purpose of providing the necessary community facilities and services to some thirty odd thousand people employed by the Commission and its contractors at the Oak Ridge installation. Most of the necessary Town management functions and services are carried out by Roane-Anderson pursuant to its cost-plus-fixed-fee contract. Roane-Anderson operates the normal municipal services, such as utilities, fire protection, garbage disposal, and maintenance of roads and streets, and also oversees the operations of concessions, and performs a number of other services necessary to the welfare of the employees at the Atomic energy facilities.

The first two cases brought are for the purpose of testing the Use Tax where Carbide and Roane-Anderson purchased from an out of State vendor. The third and

fourth cases are to test the Sales Tax, the third being where coal was bought by Carbide from the Diamond Coal Mining Company and the other being a machine bought by Roane-Anderson from the Wilson-Weesner-Wilkinson Company.

The first contention made by these appellants, along with the United States Government, is that Carbide and Roane-Anderson are not independent contractors but are agencies or instrumentalities of the United States Government and are, therefore, not subject to the tax. If the appellants are independent contractors they would be liable for the tax because the implied immunity under the United States Constitution would not apply to them for reasons hereinafter set forth, unless this implied immunity is properly implemented by a congressional act. Let us, therefore, first investigate the contracts between these appellants and the Commission and try to determine whether or not they are agencies of the Commission or independent contractors.

■ The distinctions between an independent contractor and an agent are not always easy to determine, and there is no uniform rule by which they may be differentiated. "Generally the distinction between the relation of principal and agent and employer and independent contractor is based on the extent of the control exercised over the employee in the performance of his work, he being an independent contractor if the will of the employer is represented only by the result, but an agent where the employer's will is represented by the means as well as the result." 2 C. J. S., Agency, Section 2, p. 1027.

■■ The distinction generally between an independent contractor and an agent "depends upon the intention of the parties as expressed in the contract." *Standard Oil*

*Co. of Louisiana* v. *Fontenot*, 198 La. 644, 4 So. 2d 634, 643. We must therefore in the first instance look to the contract between these parties for the intention therein expressed rather than look to the acts of the parties. Of course every case must be determined under the contract and the facts of the particular case. It frequently occurs, as it apparently does in the instant case, that contractors have made a contract with a party and have served over a long period of time in such an efficient and excellent manner that the contractor acts somewhat, in many capacities, as though he were the agent of the person with whom he has contracted. This is especially true in a cost-plus-fixed-fee contract wherein the contractor is reimbursed for any and all expenditures and he is doing the character of work he does in the instant cases. The operations of these contractors are in general separate from the normal scope of business operations of the companies; Roane-Anderson was established for the sole purpose of carrying out its community management activities under contract with the Commission; and Carbide has set up a separate division to carry out its contract with the Commission. The contracts are of a long term, continuing relationship between government and industry. They do not contemplate the performance of a particular narrowly defined task for which the outlines are fully known in advance, but are entered into with knowledge that operations are subject to continual revision, modification, and change, in the light of technical development and as a result of the evolution of Commission policy.

The programs carried on by these contractors are programs for which the Commission is responsible. The nature and scope of these programs obviously is subject to the determination of the Commission but at the same time the contractor possessing the "know-how" in its

own particular field conducts its work according to its determination of how this work should be done. The land, materials, equipment, supplies, plans, designs and records used in the operation of the facilities as well as the products of the operation, belong to the Commission. Knowledge, techniques, inventions and discoveries gained from the work are subject to strict control by the Commission. The work of the contractors is subject to close supervision at all stages and at all times by representatives of the Commission who have offices at the Oak Ridge site, and whose chief responsibilities center on the operations carried on by the operating contractor. These Commission representatives establish policy, supervise and inspect the work, review sub-contracts and purchases for approval, inspect and audit the records in accounts of the contractors, and cooperate with the contractors in the solution of the manifold problems connected with the operation of the facilities. The work must be carried on in accordance with the safety and security regulations of the Commission, and those employees of the contractors who have access to restricted data are investigated by the F. B. I., and given security clearance by the Commission. Key personnel of the contractors' organizations may be employed with the approval of the Commission. The salaries of all of their employees are controlled by policies and standards approved by the Commission, and the Commission may direct the dismissal of any such employees whom the Commission deems "incompetent, careless or insubordinate", or whose continued employment is deemed inimical to the public interest.

The contractors are not required to risk their own money in the operation of Commission facilities. This provision of the contract obviously came about by reason of the enormity of the project, the newness of what was

being done and of the uncertainty of the result. It is said that "regardless of what happened the government would pay the bill" and it was on this basis that the contracts were originally made with the various companies in the production of Atomic energy. All the contracts have a "hold-harmless" provision and the expenses and procurements are on a reimbursable basis. The Carbide contract specifically provides that Carbide shall not be obligated to use any of its own funds in the performance of work under the contract, and further provides that, upon request of the contractor, the government shall advance monies to be used for carrying out the purposes of the contract. Under this provision Carbide has used only government money for activities under its contract. Roane-Anderson originally used some of its own money in performing its contract, revenues which it collected from concessionaires and occupants of housing in Oak Ridge soon made up the greater part of its funds which were used in the contract. Roane-Anderson's contract provided that such monies collected should be used to reduce the cost of the work. Since October, 1948, Roane-Anderson has been receiving advances to carry on its work in the same manner as Carbide.

Most of the materials and supplies necessary to the operation of the Commission facilities are purchased by or through the contractors. By contract the Commission reserves the right to pay suppliers directly, but customarily permits payments to be made by the contractors, who are then reimbursed by the government. Although the contracts originally provided that title to articles acquired under the contracts should pass to the government at a point designated by the contracting officer, the record shows that as a matter of practice title to such articles has never been considered to be in the contractor

but has always been treated as having passed to the government at the time title passed from the vendor. The language of the contract is contrary to the existing practices of the parties. Since 1948, the contract of Roane-Anderson has provided expressly that in the procurement of supplies necessary to the performance of work under the contract, Roane-Anderson should act as the agent of the government, but "all personnel and labor shall be and remain for all purposes the employees of the Contractor."

The record shows that ordinarily the vendor looks to the contractor for payment. The custody then is vested in the contractor who puts it in one of the various storing houses of the Commission and the property is stamped to show that the property belongs to the United States Government and then with another designation of either Carbide or Roane-Anderson. The goods are usually shipped on a Government bill of lading or on a Commercial bill of lading with a notation to be converted to Government bill of lading at destination. This was done to save some cost in shipment expenses. Since 1948, the contractor has paid the Federal transportation tax except where shipment was to the Government on a Government purchase order.

The general manager of the Commission in a statement submitted to a congressional committee on February 17, 1949, in part said: "Operation of our plants and laboratories through established independent contractors not only gives to the Atomic Energy program substantial benefits from accumulated experience and established facilities; it also establishes the interest and support of industry and universities for future private development."

Of course the terming of these contractors, "independent contractors" by Mr. Wilson does not necessarily determine the question. We must look to the contracts, facts and intent of the parties, etc., as heretofore said. This though, does give a rather clear statement as to what the intention of the Commission was in making these contracts.

Another indication and illustration as contained in the contracts is that if the bills for the purchase of materials, machinery or equipment or payrolls are not paid promptly by the contractor or the sub-contractor, the contracting officer may in his discretion withhold payments otherwise due equivalent to the amounts of such unpaid items. The contract also provides that upon the completion of the work that the Government in making settlement with a contractor may withhold any sum necessary to settle claims against the contractor. The contract provides: "The contracting officer shall accept the completed work hereunder with reasonable promptness."

The nature of the plant operation is such that the government does not have on its staff or in its employ the technical means of qualifications to operate the plant. Each of the production plants is operated by a contractor who has considerable experience in the industrial operation of a chemical separation plant and Gaseous Diffusion plants, electromagnetic separation plants etc. The work of Roane-Anderson in city management is a specialty for which they were particularly selected.

We must hold that after making a rather thorough study of the contracts of Carbide and Roane-Anderson and the facts developed in this record that these contractors are independent contractors. Omitting for the present any consideration of the provisions of the Atomic Energy Act with reference to the contractors herein, we

might say that as far as we know the Congress has never seen fit to pass a general act immunizing general contractors who are doing work for the government wherein the government in the end had to pay the taxes assessed against the contractors. The reason that Congress has not passed such a general act is probably because ''The burden of federal taxation necessarily set an economic limit to the practical operation of the taxing power of the states, and vice versa. Taxation by either the state or the federal government affects in some measure the cost of operation of the other.'' As ''neither government may destroy the other nor curtail in any substantial manner the exercise of its powers'', the taxing power of each, so far as it affects the other, ''must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax * * * or the appropriate exercise of the functions of the government affected by it.'' *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 46 S. Ct. 172, 174, 70 L. Ed. 384.

The recent decisions of the Supreme Court of the United States have held that state taxes on independent contractors with the United States Government were subject to collection and that there was no implied immunity insofar as these independent contractors were concerned. A very excellently reasoned case is that of *James* v. *Dravo Contracting Company,* 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 155, 114 A. L. R. 318; wherein a state tax on the gross receipts of a contractor with the Federal Government was allowed. State Sales and Use Taxes on purchases of materials used by a contractor in performing a cost-plus-fixed-fee contract with the United

States was allowed in *State of Alabama* v. *King & Boozer,* 314 U. S. 1, 62 S. Ct. 43, 45, 86 L. Ed. 3, 140 A. L R. 615; *Curry* v. *U. S.,* 314 U. S. 14, 62 S. Ct. 48, 86, L. Ed 9. The court in King & Boozer case, supra, pointed out that "* * * the Constitution, *unaided by Congressional legislation,* (does not prohibit) a tax exacted from the contractors merely because it is passed on economically, by the terms of the contract or otherwise, as a part of the construction cost to the Government. So far as such a non-discriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added cost, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." (Emphasis ours.)

The question is now foreclosed under the authorities last above cited. True, eminent legal minds have differed on the conclusions reached in these cases as is evidenced by the very strong dissent of MR. JUSTICE ROBERTS in which he was joined by MR. JUSTICE McREYNOLDS, MR. JUSTICE SUTHERLAND and MR. JUSTICE BUTLER in *James* v. *Dravo,* supra. This dissent and many authorities therein cited runs somewhat like the argument on behalf of the contractors in their insistence on the first contention made, that is, that the contractors herein had an implied immunity from state taxation because the Federal Government was bearing the burden of this tax.

The second contention has given us far greater concern than the first and as we view it, it is the question in the lawsuit.

We assume, since no question is here raised, that the creation of the Atomic Energy Commission, 60 Stat. 755, 42 U. S. C. A. Sections 1801-1819, was a constitutional exercise of ''the congressional power and that the activities of the Corporation through which the national government lawfully acts must be regarded as governmental functions and as entitled to whatever immunity attaches to those functions when performed by the government itself through its departments''. *Pittman* v. *Home Owners' Loan Corp.*, 308 U. S. 21, 60 S. Ct. 15, 18, 84 L. Ed. 11, 124 A. L. R. 1263.

It was conceded in the argument that the Congress has the power to protect the instrumentalities thus created by it. This concession must necessarily follow in view of certain provisions of the United States Constitution as follows: ''The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . ..'' Article IV, Section 3, Cl. 2. It also gives Congress the power ''To make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States''. Article I, Section 8, Cl. 18, U. S. C. A. It makes the laws of the United States enacted pursuant thereto, ''the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'' Article VI, Cl. 2.

This power of Congress to prescribe tax immunity for activities connected with, or in furtherance of, the lending functions of agencies of the Federal Government has been recognized a number of times by the Supreme Court of the United States, notably in *Pittman* v. *Home Owners'*

*Loan Corporation,* supra; *Federal Land Bank of St. Paul* v. *Bismark Lumber Co.,* 314 U. S. 95, 62 S. Ct. 1, 86 L. Ed. 65; *U. S.* v. *Allegheny County,* 322 U. S. 174, 64 S. Ct. 908, 909, 88 L. Ed. 1209 and other cases therein cited.

In the Pittman case it was said by the Court that: "In the exercise of this power to protect the lawful activities of its agencies, Congress has the dominant authority which necessarily inheres in its action within the national field." [308 U. S. 21, 60 S. Ct. 18.]

In questions of the kind, whether immunity shall be extended to situations like those in the instant cases is essentially a legislative question, because as we have seen above, in the treatment of the first contention made herein, such immunity is not granted when unaided by congressional legislation. Did the Congress of the United States enact appropriate legislation to immunize the contractors involved in the instant case?

If such immunity exists, it is derived from Section 9(b) of the Atomic Energy Act, 42 U. S. C. A. Section 1809(b). The answer to the question rests primarily upon a proper construction of this section of the Act. The pertinent part thereof is as follows: "The Commission, and the property, *activities,* and income of the Commission, are hereby *expressly exempted from taxation in any manner or form* by any State, county, municipality, or any subdivision thereof." 42 U. S. C. A. Section 1809(b). (Emphasis ours).

Obviously, the question presented is whether the purchase and use of materials and supplies by cost type contractors of the Atomic Energy Commission in the performance of their contracts are part of the "activities—of the Commission" within the intendment of the provision just quoted and are thereby exempted from

taxation by any state, county or subdivision thereof "in any manner or form".

The Atomic Energy Commission as an agency of the executive branch of the United States Government is entitled to all the privileges, immunities and rights of the United States, including that of immunity from state and local taxation. *Graves* v. *People of State of N. Y. ex rel. O'Keefe,* 306 U. S. 466, 59 S. Ct. 593, 83 L. Ed. 927, 120 A. L. R. 1466. This is and would have been true had Section 9(b) of the Act above quoted not been included in the Act.

Section 9(b), in its first three sentences authorizes the Commission under stated conditions and circumstances to make payments to state and local governments (in its discretion) for loss to them of taxes due to the government taking this property and it is noted that there is no submission to state and local taxation. In the fourth and concluding sentence of Section 9(b), Congress provided the exemption above quoted in which it specifically says that the "activities"—of the Commission shall not be taxed "in any manner or form".

Should we give this exemption a narrow construction or should the exemption be construed by us so as to give it a scope commensurate with the broad activities carried on by the Commission at its major installations?

The Chancellor was of the opinion that since Congress had included the word "agents" in the second sentence of Section 9(b) of the Act, that it was not the intention of Congress to relieve these contractors from taxation. His reasoning is based upon the fact that since 9(b) expressly authorized the Commission to reimburse state and county or local governments for the amount of taxes lost by them due to the acts of the previous parties and the Manhattan District and their agents that then by

eliminating the word ''agents'' out of the exemption provision that this clearly indicated that Congress did not intend to include these contractors in the exemption.

We do not see how the Congress could have chosen a much broader word than it did when it chose the word ''activities'' to use in its application for those things that were exempt from taxation ''in any manner or form''. It seems that there was absolutely no reason in view of using this broad term ''activities'' to specify individuals or individual actors because the term within itself would cover anything that the Commission was undertaking to do.

Congress prior to the enactment of the Atomic Energy Act and subsequent thereto knew of the services of operating contractors at the major Atomic energy installations and knew that it had been the practice of the Manhattan Engineering District to conduct its activities through these operating contractors. At Oak Ridge, for example, the Monsanto, Carbide and Roane-Anderson and Stone & Webster and numerous other contractors operated in conducting the activities there and these contracts which were entered into then by the Manhattan District were transferred over to the Atomic Energy Commission by executive order of the President. At the Hanford operations the DuPont Company had served as an operating contractor during the war and was succeeded by the General Electric Company. At Los Alamos the University of California had been the operating contractor for the weapons work from the very start of activities at that remote site. Similarly the University of Chicago had been the operating contractor for the Atomic energy activities centered in the Chicago area. The Carbide people had operated the Gaseous Diffusion production facilities at Oak Ridge since they were con-

structed. The Roane-Anderson people were specially formed for the purpose of managing and operating the Town of Oak Ridge for the Manhattan District. All of these circumstances were well known to the Congress when it had under consideration the various proposals for Atomic energy legislation.

At the time hearings were held on the May-Johnson Bill, H. R. 4280, H. R. 4566, 79 Cong., 1st sess., and the McMahon Bill, S. 1717, 79 Cong., 1st sess. Congress had before it the Smyth Report, which we have heretofore referred to and quoted from, which recounted the major role of university and industrial contractors in the development of Atomic energy and the production of Atomic Bomb under the Manhattan Engineering District.

The then Secretary of War, stressed in his testimony on the pending legislation the need for continuing "well-integrated and irreplaceable organization of scientists, executives, engineers, and skilled workers." General Groves who was in charge of the Manhattan District also very forcefully pointed out the necessity of the aid of these various and sundry contractors. We can hardly see how the Congress could have done otherwise than to have fully recognized the important contribution these operating contractors had played and would continue to play in the development of Atomic energy as is shown by the prominence given their testimony before these congressional committees.

Section 4(c) (2) of the Atomic Energy Act, 42 U. S. C. A. Section 1804(c) (2), expressly provided that:

"The Commission is authorized and directed to produce or to provide for the production of fissionable material in its own facilities. To the extent deemed necessary, the Commission is authorized to make, or to continue in effect, contracts with persons obligating them

to produce fissionable material in facilities owned by the Commission. The Commission is also authorized to enter into research and development contracts authorizing the contractor to produce fissionable material in facilities owned by the Commission to the extent that the production of such fissionable material may be incident to the conduct of research and development activities under such contracts."

It thus seems to us that the Congress intended, in establishing the tax exemption, that the term "activities" used in this exemption should include the operating contractors. These operating contractors constituted the overwhelming number of employees in developing this great scientific development. If the exemption provision was limited as contended for by the Commissioner of Finance and Taxation it would be virtually meaningless, since the activities at all these large Atomic energy installations were being conducted through operating contractors, and a specific statutory immunity in behalf of the Commission as a governing body was not necessary to exempt it from taxation. These contractors represent the great share of the total expenditures made by the Commission and they constitute the major portion of this nation's Atomic energy program. Congress could hardly have used language that more aptly describes these operations than the language it used—"activities" of the Commission, Section 9(b). This Section prohibits taxation of the "activities" of the Commission in any manner or form. The evident intent was to prohibit states and local governments from imposing a tax burden upon the far flung and continuing activities of the Atomic energy program regardless of the means by which they should be carried on. One of the essential activities of

the Commission in the maintenance and operation of its facilities is the procurement of supplies.

■ Presumptively Congress does not pass or enact useless legislation. What was the purpose of immunizing "The Commission, and the property, activities, and income of the Commission"? These are exempt from taxation under the doctrine of implied immunity. Congress presumably knew that in recent years the courts were not applying the doctrine of implied immunity in various instances where the Government eventually bore the tax. It therefore seems clear that Congress did not intend to leave this question to the Courts but instead legislated on the question in such language as to cover all activities, etc., of the Government owned instrumentalities.

All the cases refusing to apply the doctrine of implied immunity contain some such statement as: "save as Congress may act to remove them" or "unaided by congressional legislation". All of which clearly imply that if the immunity claimed was aided by congressional legislation the courts would so apply the immunity sought.

We gather from Footnote 7 in the Bismarck case, supra, that when such exemptions are made by Congress that the purpose of these exemption statutes should be broadly construed in favor of the exemption. And the Supreme Court of the United States in *Pittman* v. *Home Owners' Loan Corporation*, supra, said this: "We think that this term, (referring to loans) in order to carry out the manifest purpose of the broad exemption, should be construed as covering the entire process of lending, the debts which result therefrom and the mortgages given to the Corporation as security." [308 U. S. 21, 60 S. Ct. 17.]

■ The term "activities" not being defined by the Act, must be given its usual and ordinary meaning. Webster's New International Dictionary defines the word "activity" as "natural or normal function or operation; as, the activity of a volcano." Another significant dictionary definition is: "The state of action, doing; an exercise of energy or force; an active movement or operation; a physical or gymnastic exercise, an agile performance. And Crabb's English Synonyms says: "Activity respects one's transactions".

■ The word "activity or activities" of course as applied to various things has various meanings but the ordinary accepted meaning of the term when applied to any particular thing is that it covers everything that the individual or the corporation does. It is so broad that it reaches a circumference of all the acts or doings of a corporation or an individual. It seems to us that Congress in using this term in this exemption clause did so advisedly and for the purpose of covering everything that the Commission did. By using such a broad term it of course was not necessary to set out specific instances of different things that the Commission did so as to exempt them because the word activities covered all of these things. We are therefore of the opinion that in view of this congressional legislation the taxes in question are invalid as an unconstitutional intrusion by the State upon the performance of Federal functions. The cases are therefore reversed and a judgment will be entered here for the refund of the taxes sued for. The taxes fall directly upon activities which the Commission is carrying on through its cost reimbursement contractors. The exemption in Section 9(b) of the Act was intended to protect such activities.

GAILOR and TOMLINSON, JJ., concur in the above opinion.

THE CHIEF JUSTICE and PREWITT, J., dissent for the reasons stated in a dissent of the CHIEF JUSTICE.

GAILOR, Justice (concurring).

These cases would be controlled, and the propriety of the levy of the sales tax established, by the decisions of the Supreme Court of the United States in *Alabama* v. *King & Boozer*, 314 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3, and *Curry* v. *United States*, 314 U. S. 14, 62 S. Ct. 48, 86 L. Ed. 9, except for the Act of Congress creating the Atomic Energy Commission and exempting it, its properties and activities, from State and local taxation in language which is all-inclusive, 42 U. S. C. A. Section 1809(b): "The Commission, and the property, activities, and income of the Commission, are hereby expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision thereof."

No question is made of the authority of the Congress to make the exemption from State and local taxation, and as I define the status of the Complainant operating corporations, Roane-Anderson Company, Carbide and Carbon Chemicals Corporation, and Diamond Coal Mining Company, they are independent contractors who have authority to act as Purchasing Agents for the Atomic Energy Commission in carrying out the experimental projects at Oak Ridge, Tennessee.

We have defined the Tennessee Sales Tax as a privilege tax upon retail sales, *Hooten* v. *Carson*, 186 Tenn. 282, 209 S. W. (2d) 273, to be paid by the purchaser, Code Section 1328.26, but if the purchaser, as a disclosed prin-

cipal, purchases through an agent, the tax is still upon the purchaser, who in the present case, has been exempted from payment of the tax by Act of Congress.

It is the Act of Congress and the all-inclusive exemption of the Atomic Energy Commission from all State and local taxation, that distinguishes the position of the contractors in the present case, from those in the Alabama cases cited, supra. In *Alabama* v. *King-Boozer,* supra, in the course of the opinion on page 1 of 314 U. S., on page 45 of 62 S. Ct. on page 6, of 86 L. Ed., it was stated: ''Congress has declined to pass legislation immunizing from state taxation contractors under 'cost-plus' contracts for the construction of governmental projects.''

And in setting out the contract of the United States with the contractors, it was stated to be a term of the contract that the Government undertook to reimburse the contractors, ''. . . for specified expenses including their expenditures for all supplies and materials and 'state or local taxes . . . which the contractor may be required on account of his contract to pay' ''. 314 U. S. 1, 62 S. Ct. at page 46, 86 L. Ed. at page 7.

In the present case, as stated, the Congress in all-inclusive terms, has exempted the Atomic Energy Commission from the payment of all local and State taxation.

My reasons for agreeing with the conclusions reached in the opinion of JUSTICE BURNETT, are sufficiently clear from this statement, and no elaboration would serve any useful purpose.

NEIL, CHIEF JUSTICE (dissenting).

I reach a definite conclusion, after full consideration of the record and argument of counsel, that the appel-

lants are "independent contractors" and cannot claim immunity from the State retail sales and use tax. The opinion of MR. JUSTICE BURNETT is well nigh conclusive of that question and with his conclusion I concur. But I am unable to agree with his final conclusion that they are exempt from the tax upon the theory that they are so much a part of a governmental agency, "The Atomic Energy Commission", that their purchases of materials constitutes the "activities" of such governmental agency.

The insistence of able counsel for the appellants is that these contractors, who have been employed to serve the Atomic Commission, are exempt from taxation by the express terms of Section 9(b) of the Atomic Energy Act, which reads as follows: "In order to render financial assistance to those States and localities in which the activities of the Commission are carried on and in which the Commission has acquired property previously subject to State and local taxation, the Commission is authorized to make payments to State and local governments in lieu of property taxes. Such payments may be in the amounts, at the times, and upon the terms the Commission deems appropriate, but the Commission shall be guided by the policy of not making payments in excess of the taxes which would have been payable for such property in the condition in which it was acquired, except in cases where special burdens have been cast upon the State or local government by activities of the Commission, the Manhattan Engineering District or their agents. In any such case, any benefit accruing to the State or local government by reason of such activities shall be considered in determining the amount of the payment. The Commission, and the property, activities and income of the Commission, are hereby expressly exempted

from taxation in any manner or form by any State, county, municipality, or any subdivision thereof.''

I can conceive of no theory or premise upon which to base a conclusion that the appellants come within the four corners of the above statute if they are properly classified as independent contractors. It is not only conceivable, but quite consistent with reason, that *agents* of the Commission could rightfully claim exemption from taxation on the ground that whatever they do, or contract to do, must be adjudged as an *activity* of the Commission. But even where contractors claim to be agents the Congress should, to avoid doubt and confusion, specifically declare an exemption. In a legal sense the appellants are not agents of the Atomic Commission.

The argument is made that we should by sheer inference hold that the Congress intended to exempt contractors from the tax. There is nothing in the Act exempting them and this Court should not undertake to apply to them the doctrine of implied immunity. No one questions the generally accepted principle, that the possessions, institutions, and *activities* of the Federal Government are not subject to any form of State taxation in the absence of express Congressional consent. *U. S.* v. *County of Allegheny,* 322 U. S. 174, 64 S. Ct. 908, 88 L. Ed. 1209.

It is undoubtedly true that the Congress has the power to protect all governmental agencies and instrumentalities from State taxation. But it is a far-reaching and dangerous doctrine to hold that the authority of a sovereign State to levy a tax can be nullified upon the theory of *implied delegated* immunity. It is manifestly unsound to hold that Congress intended to deny to the State its right to levy a constitutional tax upon business enterprises furnishing supplies to a Federal agency merely

because it may possibly cast upon the Government some economic burden.

The argument is made that unless the Congress meant to exempt contractors in its use of the word "activities" the statutory exemption is meaningless. I am unable to follow this contention. The Act to which reference is herein made, Section 9(b), Atomic Energy Act, exempts the "activities" of the Commission. The word "activities" should be construed as exempting property that the Commission has acquired. In other words, such resources, both tangible and intangible that may be in its possession and under its control which is devoted to the development of atomic energy. The Special Committee of Congress, appointed to consider the said Act, made the following report:

"Section 9. Property of the Commission."

"The Commission is to take over all resources of the United States Government devoted to or related to atomic energy development. This includes all atomic weapons, all property of the Manhattan Engineer District, and all patents, materials, plants and facilities, contracts, and information relating primarily to atomic energy. The Commission is authorized to reimburse States and municipalities for loss in taxes incurred through its acquisition of property".

There is no reason for this Court to construe "activities" as providing for an exemption from State taxation when the Congress refused to adopt an amendment which would have expressly exempted contractors from such a tax. In *Standard Oil Co. of La.* v. *Fontenot,* 198 La. 644, 4 So. (2d) 634, 642, it is pointed out by the Court: "Prior to the passage of Public Act 588 of the 76th Congress, 54 Stat. 265, the language therein, which would have made such contractors agents of the government *and*

*would have exempted them from all taxes—federal state and local, was stricken therefrom* in the House and was concurred in by the Senate. Cong. Rec., Vol. 80, part 7, pages 7532-7535, Amd't. 1205, H. B. 8438; Cong. Rec., Vol. 86, part 7, pages 7646-7648.'' (Emphasis supplied.)

In *Alabama* v. *King* & *Boozer,* 314 U. S. 1, 62 S. Ct. 43, 45, 86 L. Ed. 6, the Court, speaking through MR. CHIEF JUSTICE STONE says: ''Congress has declined to pass legislation immunizing from state taxation contractors under 'cost-plus' contracts for the construction of governmental projects. Consequently the participants in the present transaction enjoy only such tax immunity as is afforded by the Constitution itself, and we are not now concerned with the extent and the appropriate exercise of the power of Congress to free such transactions from state taxation of individuals in such circumstances that the economic burden of the tax is passed on to the national government.''

There should be no disagreement upon the proposition that the word ''activities'' as used in Section 9(b) should be broadly construed. It should be so construed in all those cases where the Congress has expressly declared that a State tax is such a burden upon the particular instrumentality that it amounts to an impairment of the power of government. The contention of the State, while not disputing the foregoing proposition, is that the Court is not authorized to extend the exemption by *construction* ''so as to exempt an independent contractor from non-discriminatory, constitutional excise taxation.'' The correctness of this contention will not be seriously controverted in the face of the Congress's *express refusal* to provide for an exemption.

I cannot conceive that Congress would ever agree to an exemption of "contractors" from State taxation as contended for in the case at bar. Is it possible that the Congress, in exempting "activities" of a Federal Bureau from liability for a State tax, intended thereby to exempt every person, firm or corporation who might do business with it pursuant to a written contract? I think not. If that is not an *implied* delegation of immunity, I don't know how to classify it. That the Congress never intended to provide an exemption in such circumstances is not only shown by the Congressional Record, as pointed out in *Standard Oil Co. of La.* v. *Fontenot,* supra, but also in *Penn. Dairies* v. *Milk Control Comm.,* 318 U. S. 261, 63 S. Ct. 617, 87 L. Ed. 748.

The country is now witnessing, and has for a number of years, the vast increase in the number of Federal agencies claiming immunity from State taxation under the specious plea that "we are the Federal Government." They seek to extend the immunity, as illustrated by the present appeal, to all who may have a contract with them to render some form of service, or furnish them supplies of any kind. If the plea is good it results that Congress has clothed them with attributes of government which is superior to that of a sovereign State. The cases cited on the State's brief, and particularly *Penn. Dairies* v. *Milk Control Comm.,* supra, are conclusive of the question that Congress has had no thought of thus paralyzing the taxing authority of State governments.

If, however, I am mistaken in this conclusion, and the State of Tennessee is powerless to collect its just revenues, we should no longer think of "State sovereignty" as it has been known in the country's history for more than a century and a half, but that sovereignty now exists at

the whim, and possible caprice, of agencies which are a law unto themselves.

In my opinion the appellants have no right to claim an exemption from the tax in question, in the absence of an express statutory provision, unless it plainly appears that it constitutes an encroachment upon, or interference with, the free exercise of governmental authority.

PREWITT, J., concurs in this dissenting opinion.