Robert YOUNGBLOOD and
wife, Patricia Youngblood,
Plaintiffs–Appellants,

v.

Howard D. WALL and Sally Jones Wall,
d/b/a Snow and Wall Realtors, Billie
W. Greenberg, Individually and as
agent for Snow and Wall Realtors, and
Larry K. Tolbert, Substitute Trustee,
Defendants–Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 21, 1991.

Application for Permission to Appeal
Denied by Supreme Court
Aug. 5, 1991.

Royce Taylor, Murfreesboro, for plaintiffs-appellants.

Larry K. Tolbert, Murfreesboro, for defendants-appellees.

## OPINION

LEWIS, Judge.

Plaintiffs Robert and Patricia Youngblood appeal from the final decree of the trial court which 1) divested from them their interest in a certain property on Central Valley Road in Rutherford County, Tennessee, and vested it in defendants Howard and Sally Wall;[1] 2) decreed a promissory note of $29,000.00, which was executed by Jack L. Johnson and payable to Youngblood, to be the sole and exclusive property of the Walls; 3) granted the Youngbloods the proceeds left from the resale of the Central Valley Road property after the payment of all costs, expenses, and taxes associated with that property; and 4) rendered judgment against defendant Greenberg in favor of the Youngbloods in the amount of $3,690.00, the amount of Greenberg's commission earned by selling the Central Valley property to the Youngbloods.

The pertinent facts are as follows:

The Youngbloods lived in a house owned by Mr. Youngblood (the O'Brien house). While not actively looking for a new house,

---

1. We will hereafter refer to plaintiffs Robert and Patricia Youngblood as either plaintiffs or Youngblood and defendants Howard and Sally Wall as either Wall or defendants.

Mrs. Youngblood especially was anxious to move from the O'Brien house. While out for a Sunday ride, they attended an "open house" on the Central Valley property. Interested in the property, they entered into discussions with defendant Greenberg.

Greenberg was a licensed affiliate broker who had been associated with Snow and Wall Realtors for sixteen years. She zealously pursued a sale of the Central Valley property to the Youngbloods. Subsequently, the Youngbloods entered into a contract to purchase the Central Valley house subject to the sale of the O'Brien house.

Although the Youngbloods had approximately $30,000.00 equity in the O'Brien house, they also had three mortgages on it. Greenberg found a buyer for the O'Brien house with agreed terms of the contract being that the buyer would assume the first mortgage on the property and Youngblood would accept a $29,000.00 note for his equity in the property.

Greenberg and the Youngbloods set about arranging the financing of the Youngblood's purchase of the Central Valley property. There were problems with financing from the very beginning. Part of the problems concerned the Youngblood's risky credit rating while the rest of the problems stemmed from the misconduct surrounding their efforts to make the credit picture look rosy enough to obtain permanent financing.

The Youngblood's credit report contained derogatory information, and Youngblood owned business property which was foreclosed on during this time period. The business property burned within a few weeks of the announced foreclosure, and arson was suspected. The insurance company paid the mortgagee but refused to pay any amount to the Youngbloods.

The central obstruction, however, to Youngblood's ability to obtain financing for this property was his failure to file personal income tax returns for the years 1985 and 1986 and his and Greenberg's attempt to present falsified returns to the various mortgage companies and banks he and Greenberg visited in the attempt to obtain financing.

Greenberg first approached Guaranty Trust Company about a Veteran's Administration (VA) loan on the property. The loan officer told Greenberg and the Youngbloods that since Youngblood was self employed, he would have to submit a copy of the Youngbloods' 1985 and 1986 tax returns as verification of income before the loan could be processed.

At this point, Greenberg supplied Mr. Youngblood with copies of someone else's tax returns which she knew contained the figures necessary to qualify for a loan of this size. There is contradictory testimony as to whether it was Mr. Youngblood or Greenberg who filled out false returns based on these figures, but one or both of them did. Greenberg then gave these returns to various mortgage lenders with or without the Youngbloods' knowledge or consent. These fraudulent returns proved insufficient to secure loan approval.

When the loan officer informed Greenberg that the VA was going to turn down the loan because of the lack of certified income tax returns, she had the loan application transferred to First Southern Bank. When that bank also rejected the Youngbloods, she tried to arrange permanent financing for them through Ahmanson Mortgage Company. Approximately the third week in October, 1987, a loan officer at Ahmanson informed Greenberg that their computer had "kicked the loan out" because of the lack of certified tax returns.

By this time the Youngbloods had already moved into the Central Valley house, and closing on both properties was set for 28 October 1987. At various times prior to the closing date, both the Youngbloods and the sellers of the Central Valley property had second thoughts about this sale and indicated their inclination to rescind the deal. Greenberg kept the deal on track by assuring all parties that permanent financing was just around the corner. Greenberg knew prior to the Youngbloods' move onto the Central Valley property that the VA had rejected the Youngblood's loan application. She deliberately withheld this information from them until the day before closing.

When it was evident that permanent financing was not going to be forth coming before the closing date, Greenberg secured a ninety day "bridge" loan from First Southern Bank in the amount of $102,-500.00. The Walls co-signed this temporary note, and the Youngbloods put up the deed of trust on the Central Valley property and the $29,000.00 note on the O'Brien property as collateral.

Just before the closing, it became apparent that because of Youngbloods' second and third mortgages on the O'Brien property, $9,500.00 additional monies were necessary to clear the title so the property could be sold. Greenberg prevailed upon the sellers of the Central Valley property to advance that amount to Youngblood out of their equity in exchange for a sixty-day note from him. According to Mr. Carter, the seller, "I was persuaded that it was in my best interest by Snow and Wall Realty Company."

Mrs. Youngblood expressed grave reservations about selling her home in this manner. According to her testimony at trial:

The first I knew of that (the note to the Carters for $9,500) was when the date of the closing. We were to meet at Snow and Wall in Mrs. Greenberg's office. We went into her office, and she said that we needed $9,400 to make everything balance out. And Bob got up and went into the bathroom. And I looked at her, and I said, Billie, our house hasn't been sold yet; I'm pregnant; Bob doesn't want to put me through any more than I've already been through. He is willing to go that extra mile. *I said that I had rather move back into our house on O'Brien Drive.* We can build on, or we can sell it straight out instead of $15,000 down and then us assume a second loan. *I said, I just don't want to do that unless you're absolutely positive. She assured me right there in her office that it was two weeks at the most.*

(emphasis added).

When the note was not paid in sixty days, the seller foreclosed. Two days before the 90 day note was due, First Southern asked the Walls to pay it. The Walls

did so and promptly foreclosed. Still trying to obtain permanent financing, the Youngbloods tried to prevent this foreclosure.

When an attempt at bankruptcy proved unsuccessful, they filed this action in Chancery Court. They alleged, *inter alia*, that they had relied on Greenberg's representations that verbal approval had been given on a loan package in making their decision to move into the Central Valley house before permanent financing had been obtained, that they had closed the sale without permanent financing because of reassurances from both Greenberg and the Walls that permanent financing would be available, and that the Walls had agreed prior to the closing to co-sign on permanent financing if the need arose. They asked for an injunction blocking the sale, for compensatory and punitive damages, and that Mr. Tolbert be disqualified from acting as Substitute Trustee on the property.

The trial court allowed the sale to go forward, subject to the court's approval. An auction was held with only the Walls and the Youngbloods in attendance. The Walls' bid of $85,691.29 was the only bid on the property. The court refused to approve the sale, and the property was subsequently sold to separate buyers for a total of $110,900.00 with the court's approval.

The Youngbloods ostensibly present two issues for our review. The first issue is whether a real estate broker is "liable for the misrepresentations of his or her agent when the broker is unaware of the misrepresentations." The second issue is whether the agent is "only liable to the appellant for her commission as a result of her misrepresentations." They indicate toward the end of their brief that the real issue for our review is "the measure of damages." At oral argument, counsel for the Youngbloods told this Court: "The real issue then becomes whether or not the damages are sufficient and whether or not the agent's principal should also be liable in this."

Appellees Howard and Sally Wall, Billie Greenberg, and Larry Tolbert ask this Court to determine:

1.  What is the legal relationship between a licensed real estate broker and a licensed affiliate real estate broker? Agent? Employee? Independent contractor?
2.  Is a real estate broker liable for the fraudulent/illegal/unethical conduct of an affiliate broker when the broker has no knowledge of such conduct?
3.  Did the Trial Court err in awarding judgment against Defendant Greenberg in favor of Plaintiffs Youngblood?

The first issue this Court will consider is whether the trial court erred in awarding judgment against Greenberg in favor of the Youngbloods.

The Youngbloods testified that they were induced to sell their home and induced to attempt to buy the Central Valley property by untrue statements from Greenberg that permanent financing of the buy was only weeks away. They asked the trial court for compensatory and punitive damages for the harm done them by her misrepresentations to them.

The trial court found that Greenberg had made material misrepresentations to the Youngbloods and that these misrepresentations had harmed them.[2] We review that finding "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn.R.App.P. 13(d).

The record shows that in order to collect her commission from the Youngbloods on the sale of the O'Brien property and from the Carters on the sale of the Central Valley property, Greenberg induced the Youngbloods to sell their house, to move into the Central Valley house without permanent financing first being arranged, and to put up their equity from the sale of the O'Brien property as collateral on the 90 day note to First Southern Bank. She told them permanent financing was only weeks away and urged them to move into the

Central Valley home. She did not tell them that their loan applications had been rejected by every lender she had taken them to see. Instead, she led them to believe the loans were still being processed. She convinced them to take a note for the equity in the O'Brien property and to assign that note to First Southern on the bridge loan. Greenberg was of the opinion that the bridge loan would save the deal and talked all concerned into adopting that idea. She told the Youngbloods that the Walls would co-sign on permanent financing if none was forthcoming within the 90 day period, leading them to believe that their equity was safe.

Greenberg had a duty to the Youngbloods of undivided fidelity and faithfulness as regards the sale of the O'Brien property; she had a duty to refrain from prejudicing their interests in favor of her own. *Reece v. Homestead Realty, Inc.*, 626 S.W.2d 711 (Tenn.App.1981). As regards both sales, she had a duty of honesty, candor and fair dealing to all those with whom she was dealing, including the Youngbloods, even though she was not in an express principal agency relationship with the Youngbloods as to the Central Valley sale. *Hughey v. Rainwater Partners*, 661 S.W.2d 690 (Tenn.App.1983). By her actions, Greenberg breached her duty to the Youngbloods. This breach of duty amounted to tortious conduct toward the Youngbloods for which Greenberg is liable. *Scott v. Burton*, 173 Tenn. 147, 114 S.W.2d 956 (1938).

This issue is without merit.

We next look at Greenberg's relationship to the Walls.

Both appellants and appellees have asked us to determine whether the Walls are also liable to the Youngbloods based on this relationship. Appellants insist that Greenberg is the agent of the Walls while the Walls (and presumably Greenberg) urge us to decide that Greenberg is an independent contractor. Even though the trial court

---

**2.** The trial court found that the Youngbloods also made material misrepresentations. However, a de novo review of the record reveals that all of the Youngbloods' material misrepresentations were made to third parties; they were honest with Greenberg from the start, and she joined in their unsuccessful efforts to defraud the mortgage companies.

found that the Walls were "blameless of any wrongdoing," the court did not make a finding of fact as to the characterization of the Greenberg/Wall relationship.

■ In cases involving a determination of such a relationship, the exact relationship must be determined under the contract between the two parties (the Walls and Greenberg) and the facts of the particular case. *Carbide & Carbon Chem. Corp. v. Carson,* 192 Tenn. 150, 239 S.W.2d 27 (1951), *aff'd,* 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952). Relevant factors to consider are:

1) Whether or not the one employed is engaged in a distinct occupation or business; 2) The kind of occupation with reference to whether in the locality the work is usually done under the direction of an employer or by a specialist without supervision; 3) The skill required in the particular occupation; 4) Whether the employer or workman supplies the instruments, tools and place of work of the person doing the work; 5) The length of time for which the person is employed; 6) Method of payment, whether by time or by job; 7) Whether or not the work is part of the regular business of the employer; 8) Whether or not the parties believe they are creating the relationship of master and servant; and, 9) Whether the principal is or is not in business.

*Henry v. United States,* 452 F.Supp. 253, 254 (E.D.Tenn.1978).

■ A de novo review of the record reveals the following facts. Greenberg was a licensed affiliate real estate broker. She had been affiliated with Snow and Wall Realtors for sixteen years. She maintained her office in their agency building, and there is no evidence that she paid rent or utilities on either the space or the office equipment, including the telephone. Greenberg was engaged at Snow and Wall in the regular business of Snow and Wall. The contract signed for the sale of the Central Valley property states that Snow and Wall, not Greenberg, is the agent for the seller. Regarding payment of the commissions on the sale, the contract states: "Upon consummation of this contract Snow and Wall Realtors Company(ies) as agent(s) shall receive a commission of 6% based on total consideration, to be paid by seller." There is no evidence in the record that either the Carters or the Youngbloods wrote their commission checks to Greenberg or that she received 6% of the sale price of either house as her commission on the sales. On the contrary, the Youngbloods bought the Central Valley property for $102,500.00 and the trial court found that Greenberg's commission on this sale was $3,690.00. Simple arithmetic computes this to be 60% of the 6% commission paid by the Carters.

■ Under Tennessee law, if there is one factor more indicative of an employer/employee relationship than any of the others, it is the employer's right of control over work done for him. *Bush Bros. & Co. v. Hickey,* 223 F.2d 425 (6th Cir.1955). This right to control is not dependent on whether the employer exercises the right; it is merely material that the right exists. *Carver v. Sparta Elec. Sys.,* 690 S.W.2d 218 (Tenn.1985).

There is evidence in this record that Snow and Wall not only had the right to control the performance of the work but that they exercised that right as well. Greenberg did not complete both sales and then present the closed sales to Snow and Wall for the payment of her commission. Instead, Mr. Wall was continually checking with Greenberg on the progress she was making in her efforts to obtain financing for Youngblood. Mr. Wall participated in discussions with Mr. Youngblood and Greenberg on how best to pursue this financing. Both Walls participated in the decision to pursue a bridge loan to the extent that they even agreed to co-sign. Mr. Carter only accepted a note for $9,400.00 of his equity in the Central Valley property because he "was persuaded that it was in (his) best interest by Snow and Wall Realty Company." Mr. Wall controlled the activity of Greenberg to the extent that when Youngblood came to her after the Walls had foreclosed on him, Mr. Wall told Greenberg to have no further

discussions with Youngblood, and she obeyed this command.

A preponderance of the evidence shows that Greenberg was in an employer/employee relationship with the Walls. The burden was on the Walls to show that Greenberg was an independent contractor in order to avoid liability for her actions. *National Life & Acc. Ins. Co. v. Morrison,* 179 Tenn. 29, 162 S.W.2d 501 (1942). They have not met this burden.

■ The employer is generally liable for the frauds and misrepresentations of his employee made within the scope of that employment even when he has no knowledge thereof under the doctrine of respondeat superior. *Holloway v. Howerdd,* 536 F.2d 690 (6th Cir.1976); *Ellis v. Bruce,* 5 Tenn.App. 344 (1927). This is no less true when the employer is a real estate agency and the employee is that firm's agent. *McNeill v. Dobson–Bainbridge Realty Co.,* 184 Tenn. 99, 195 S.W.2d 626 (1946).

The Walls are liable for the harm caused to the Youngbloods by the misrepresentations of Greenberg.

We now turn to the award of damages to the Youngbloods. In their complaint the Youngbloods asked for compensatory and punitive damages from the Walls and Greenberg. The trial court found that Greenberg "was partially responsible for certain non-disclosures which were material and which did cause Plaintiffs to suffer a loss." The court did not make a finding as to the amount of the loss suffered by Youngblood.

■ The basic rule prescribing the measure of damages for fraud is that the injured party should be compensated for the actual injuries sustained by placing him or her in the same position that he or she would have occupied had the wrongdoer performed and the fraud not occurred.

*Blasingame v. American Materials, Inc.,* 654 S.W.2d 659 (Tenn.1983).

■ One who in a real estate transaction in which he has a pecuniary interest supplies false information for the guidance of others is subject to liability for the pecuniary loss caused to them by their justifiable reliance on such information. *Chastain v. Billings,* 570 S.W.2d 866 (Tenn.App. 1978).

■ The misconduct for which defendants are liable are those misrepresentations which induced the Youngbloods to sell the O'Brien property and give up all rights to the equity they had therein.[3] As a result of those misrepresentations, the Youngbloods lost their home on O'Brien.

The trial court awarded the Youngbloods damages in the amount of $3,690.00 which was equal to Greenberg's "portion of the real estate commission paid upon the sale of the Central Valley Road property." We are unable from the record to determine how the trial court arrived at this figure unless it was an effort to extract from Greenberg any monies she might have made from the transaction. Under the record before us this does not compensate for the actual damages sustained by the plaintiffs. This amount has very little, if anything, to do with the measure of damages.

We are therefore of the opinion that this matter must be remanded to the trial court for the assessment of damages.

We remand because the amount of damages under this record is to a great extent dependent upon the credibility of witnesses and the trial court, who has the opportunity to see and hear the witnesses testify, should determine the amount of damages to which the plaintiffs are entitled.

The judgment of the trial court in dismissing Howard D. Wall and Sally Jones Wall, d/b/a Snow and Wall Realtors, is

---

3. Greenberg told the Youngbloods she had received verbal approval of their VA loan application with First Guaranty Trust Company. She withheld from them the information that that loan application, and all other loan applications they had submitted, had been rejected. When Mrs. Youngblood informed her that the Young- bloods were ready to forego selling their house and to forget about buying the Central Valley property, she assured them that permanent financing on the Central Valley property was only weeks away and that they would be foolish to give up now.

reversed and the trial court's judgment awarding damages against defendant Greenberg in the sum of $3,690.00 is reversed.

On remand, a judgment shall be entered for plaintiffs against the defendants Howard D. Wall and Sally Jones Wall, d/b/a Snow and Wall Realtors, and Billie W. Greenberg, and a hearing shall be had on the amount of damages to which the plaintiffs are entitled. Costs of this appeal are taxed to the defendants Wall and Greenberg.

TODD, P.J., and KOCH, J., concur.