[No. 31962. *En Banc.* April 14, 1953.]

GENERAL ELECTRIC COMPANY, *Respondent,* v. THE STATE OF WASHINGTON, *Appellant.*[1]

*The Attorney General* and *Jennings P. Felix, Assistant,* for appellant.

*Reuben C. Carlson* (*Ellis N. Slack* and *Berryman Green,* of counsel), for respondent.

[1]Reported in 256 P. (2d) 265.

GRADY, C. J.—This action was instituted by General Electric Company to recover from the state of Washington the sum of $938,437.25, with interest, representing business and occupation taxes paid. The court entered a judgment for the amount claimed. The state of Washington has taken this appeal.

Some years ago, the United States constructed a plant at Hanford, Washington, for the manufacturing of fissionable material. In 1943, a contract was made with E. I. du Pont de Nemours and Company, Inc., a foreign corporation authorized to do business in the state of Washington, to carry on the manufacturing activity. The contract was negotiated and executed pursuant to the first war powers act of 1941. The question of liability to the state of Washington for the payment of business and occupation taxes was considered. The record indicates the corporation was seeking ways and means whereby in the performance of its contract with the United States it might be able to avoid payment of such taxes. A suggested method was the insertion in the contract of an agency clause, but this was not done. The thought was expressed that the attendant difficulties would more than offset the comparatively small tax saving involved.

The corporation and the United States sought a ruling from the state tax commission upon the question whether in performing its contract the corporation would be engaged in such a business activity that it would be amenable to the business and occupation tax, and also whether in the performance of the contract it would be an instrumentality or agency of the United States. It was recognized that the performance by a private corporation of a contract with the United States did not grant it immunity from a business and occupation tax, and the reason assigned was that the incidence or impact of the tax was not upon the operations of the corporation as an agency or instrumentality of the United States, but upon the corporation in its private capacity. It appears from the record that this recognition was based upon rules pronounced in *Silas Mason Co. v. Tax Commission*, 302 U. S. 186, 82 L. Ed. 187, 58 S. Ct. 233, and

*James v. Dravo Contracting Co.*, 302 U. S. 134, 82 L. Ed. 155, 58 S. Ct. 208, 114 A. L. R. 318. The tax commission made a ruling that the corporation would not be an agency or instrumentality of the United States in the performance of its contract, would not be immune from such tax, and that it would be engaged in a business activity within the meaning and intent of Laws of 1935, chapter 180, p. 706, as amended (RCW 82.04).

Respondent is the successor of the du Pont company. It is a foreign corporation, is authorized to transact business in this state, and is normally subject to its business and occupation tax. As a part of its business, the corporation manufactures fissionable material and uses specially constructed facilities owned by the United States.

The following statutes are a part of our business and occupation tax laws:

" 'Business' includes all activities engaged in with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly." (RCW 82-.04.140.)

" 'Engaging in business' means commencing, conducting, or continuing in business and also the exercise of corporate or franchise powers as well as liquidating a business when the liquidators thereof hold themselves out to the public as conducting such business." (RCW 82.04.150.)

" 'Manufacturer' means every person who, either directly or by contracting with others for the necessary labor or mechanical services, manufactures for sale or for commercial or industrial use from his own materials or ingredients any articles, substances or commodities. When the owner of equipment or facilities furnishes, or sells to the customer prior to manufacture, all or a portion of the materials that become a part or whole of the manufactured article, the tax commission shall prescribe equitable rules for determining tax liability." (RCW 82.04.110.)

" 'To manufacture' embraces all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful article of tangible personal property or substance of trade or commerce is produced and shall include the production or fabrication of special made or custom made articles." (RCW 82.04.120.)

In September, 1946, respondent entered into a contract with the United States pursuant to the authority given by the first war powers act of 1941. In June, 1947, respondent and the United States made a supplemental contract pursuant to authority given to the latter by the atomic energy act of 1946 (Public Law No. 585, 79th Congress, 60 Stat. 755, 765, 766, 42 U. S. C. A. 803, 819, 820, § 1809(b)). The courts of this state have been asked in this action to construe the contract between respondent and the United States and determine whether one of the activities in which the respondent is engaged, the manufacturing of fissionable material, is that of the atomic energy commission or its own activity.

Because of the secrecy necessarily surrounding the manufacturing process in which respondent is engaged, it has agreed in its contract to submit to many contractual conditions with reference to supervision by government agents in the purchase of supplies and equipment, in fiscal affairs, and in many other respects not necessary to set forth, none of which, however, are inconsistent with or change the status of respondent as one engaged in business as a manufacturer, as defined by statute.

It is the contention of respondent that, by the terms of its contract with the United States, a relationship has been created whereby it must be said that the manufacturing business in which it is engaged is that of the governmental agency, and, therefore, it is immune from the business and occupation tax by virtue of § 9(b) of the atomic energy act of 1946. The part of § 9(b) relied upon reads:

"The Commission, and the property, activities, and income of the Commission, are hereby expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision thereof."

The respondent cites and relies upon the cases of *Roane-Anderson Co. v. Carson*, 192 Tenn. 150, 239 S. W. (2d) 27, and *Carson v. Roane-Anderson Co.*, 342 U. S. 232, 96 L. Ed. 257, 72 S. Ct. 257. We do not think the statute or the cited cases meet the question we have before us in this case, or that we should feel bound by the decision of the United

States supreme court. In that case and the Tennessee case being reviewed, sales and use taxes were involved. The Tennessee court found as a fact that the goods sold and purchased became the property of the government and were in reality paid for by government money; hence, they were not subject to the Tennessee sales and use tax. The United States supreme court accepted the findings of fact made by the Tennessee court and affirmed its judgment.

The supreme court of Arkansas has recently decided in a similar case that, if the contractor is the purchaser of the goods, a sales tax is collectible; but if the United States is such purchaser, the taxes are not collectible; also, that who is the purchaser of the goods, is a question to be determined by state law, upon which subject only the courts of the state can speak with final authority. *Parker v. Kern-Limerick, Inc.*, 254 S. W. (2d) (Ark.) 454. The court cited *Alabama v. King & Boozer*, 314 U. S. 1, 86 L. Ed. 3, 62 S. Ct. 43, 140 A. L. R. 615, holding to the same effect.

The questions before us are purely domestic and must be determined by a construction of the contract and the application of our statutes. The part of the atomic energy act above quoted is not before us for construction or application and does not affect respondent or appellant. The governmental agency is not carrying on any activity in connection with the manufacturing business of respondent, and therefore § 9 (b) of the act has nothing to do with the legal questions we have under consideration. The incidence or impact of the tax falls only on respondent as a business corporation and not as an agency or instrumentality of the United States. The act does not in any way attempt to affect the operation of the business and occupation tax upon those who engage in manufacturing in this state, even though they may do so pursuant to a contract with the United States. If it did so, a very serious constitutional question involving the power of the United States to restrict the right of this state to impose such a tax upon those who exercise the privilege of doing business within its borders would be raised.

■ The manufacturing of fissionable material by respondent is done by it, not as an agent or instrumentality of the United States, but as a part of its authorized corporate functions. The taxpaying status of respondent must be determined by our statutes, and not by any status or relationship attempted to be created by contract. It is the nature of the business done by respondent in this state that must determine its taxpaying status, and not what it may denominate itself in its contract. The adroit use of words and phrases in the contract by which it is sought to establish a relationship between itself and the governmental agency whereby its manufacturing business and activity can be said to be that of the agency, is of no avail.

Reduced to its simplest form, we have a business corporation engaged in manufacturing a high explosive and delivering its product to a governmental agency. Our statute authorizes the imposition of a business and occupation tax for the privilege of carrying on such an activity in this state. The facts that respondent uses buildings and facilities of the agency, that by contract it has submitted to certain supervision, and that special fiscal arrangements are provided for, do not make such activities those of the governmental agency, nor do they make respondent such an instrumentality of the United States or of the agency that it is immune, expressly or impliedly, from the business and occupation tax.

The reasoning of the court in the case of *Carson v. Roane-Anderson Co.*, 342 U. S. 232, 96 L. Ed. 257, 72 S. Ct. 257, and in *Roane-Anderson Co. v. Carson*, 192 Tenn. 150, 239 S. W. (2d) 27, is unsound when applied to the situation presented by the record in this case. We find no reason based either on § 9 (b) of the atomic energy act or the foregoing cases to depart in any way from what we decided in *Mason, Inc., v. State Tax Commission*, 188 Wash. 98, 61 P. (2d) 1269. The constitutional right of the state of Washington to exact a business and occupation tax from a corporation given the privilege of doing business within its boundaries and having a contract with the United States, was sustained on appeal.

*Silas Mason Co. v. Tax Commission*, 302 U. S. 186, 82 L. Ed. 187, 58 S. Ct. 233.

The judgment is reversed, and the case remanded for the entering of an order dismissing the action.

MALLERY, HILL, HAMLEY, WEAVER, and OLSON, JJ., concur.

FINLEY, J. (dissenting)—Section 9(b) of the atomic energy act of 1946 (Public Law No. 585, 79th Congress, 60 Stat. 755, 765, 766, 42 U. S. C. A. 803, 819, 820, § 1809(b), in part, reads:

"The Commission, and the property, *activities*, and income of the Commission, are hereby expressly *exempted from taxation in any manner or form* by any State, county, municipality, or any subdivision thereof." (Italics mine.)

Italicized and mentioned particularly here at the start of this discussion is the fact that the exemption from taxation, contemplated by § 9(b), is from "*taxation in any manner or form by any State, county, municipality, or any subdivision thereof.*" Of even further significance is the decision of the United States supreme court in *Carson v. Roane-Anderson Co.*, 342 U. S. 232, 96 L. Ed. 257, 72 S. Ct. 257, and its controlling effect here respecting disposition of the instant appeal. In *Carson*, the court, in the broadest of language, recently construed § 9(b) and invalidated a Tennessee sales and use tax (as applied to certain taxpayers) on the ground that *activities* of the atomic energy commission were involved.

The question in the instant case is whether the above legislation *prevents imposition of the business and occupation tax* of the state of Washington upon the General Electric Company, a New York corporation. The tax is occasioned and its amount is measured, in effect, by the corporation's operations in this state (pursuant to its contract with the atomic energy commission), *as the operator of the atomic energy plant at Hanford, Washington, and the related facilities thereof for the United States government.*

The majority opinion brushes aside any suggestion that § 9(b) and the *Carson* case are controlling. It is said that the instant case must be decided on the basis of state statutes, and that no Federal statute is involved. This I cannot follow

or understand. I certainly recognize the general principle—that interpretations of state statutes by the supreme court of this state are controlling, under certain circumstances. However, this assumes the absence of any applicable valid Federal statute, power or authority. Applying the above general principle, is begging the question if, in fact, a valid Federal statute is applicable. Here in the instant case, it seems crystal clear to me that § 9 (b) does apply; particularly, because of the manner in which it has been construed in the *Carson* case.

The majority cite and rely upon *Silas Mason Co. v. Tax Commission,* 302 U. S. 186, 82 L. Ed. 187, 58 S. Ct. 233, in support of the proposition that the state of Washington can constitutionally impose its business and occupation tax upon a corporation doing business in the state in the performance of a contract with the United States government. I have no quarrel with the *Mason* case whatsoever. But in the instant case, something new has been added—namely, the enactment of § 9 (b), and the assertion thereby of a Federal power, absent in the *Mason* case. It appears to me that the *Mason* case is distinguishable, and that it simply is not applicable to the instant case.

*Parker v. Kern-Limerick, Inc.,* 254 S. W. (2d) (Ark.) 454, is cited by the majority. Basically, the *Parker* case is subject to the same analysis and criticism as the majority opinion herein.

Now to get back to some further pertinent, explanatory facts. The corporation is in all respects qualified to do business within the state of Washington. Its contract with the government was (1) entered into on May 15, 1946, under authority of the first war powers act, 1941 (Public Law No. 354, 77th Congress, Dec. 18, 1941); (2) subsequently, formally approved and adopted by the atomic energy commission on January 28, 1947, under authority granted to the commission by the atomic energy act of 1946. The superior court for Thurston county held that § 9 (b) prohibited imposition of the tax. Judgment was entered ordering the state to refund the tax paid by the corporation in the sum of

$938,437.25, plus interest thereon. The state of Washington has appealed.

For a variety of reasons, the costs of government have rocketed to astronomic levels in recent years. Without debating the "pros" or "cons" of this economic phenomenon of modern life, it can be said quite impartially, and with little fear of contradiction, that the problems of finding sources of revenue, ways and means of imposing and collecting taxes to meet the costs of government, have become most difficult. This is particularly true at the state and other local levels of government. Overlapping and duplication, double, or perhaps treble, taxation with respect to particular items of property, and competition for tax revenue between taxing authorities, complicate matters further and to a very considerable degree. In this setting, the instant case comes to this court. Apparently, the Federal government is concerned, and legal counsel for the United States government have sought to assist respondent corporation in escaping liability for payment of the tax. The amount presently involved is significant. Future and further implications are even more significant. The state of Washington is concerned and quite naturally is resisting this potential loss of tax revenue.

As an abstract proposition, our interest and sympathy may support the official policy taken in this matter by the state of Washington. However, it is obviously the duty of this court to decide the case on the basis of legal principles— personal inclinations, sympathies, or interests to the contrary, notwithstanding.

The potential loss of tax revenue to the state of Washington is serious. It would be even more shocking, except for the fact that the state does benefit tax-wise in other respects most significantly, as a result of the operations of the Federal government's atomic energy plant at Hanford, Washington. Among other things to be noted is the large personnel payroll, most of which is expended by employees in this state for cost-of-living items and for other lesser luxuries which they can afford. The circulation of this payroll, its mo-

mentum and impact upon our total sales and other tax revenues, is considerable.

Counsel for respondent concede the status of the corporation is that of an independent contractor. But the provisions of the contract could be construed to place respondent in the category of an agent of the Federal government. It can be readily seen that the contract between the respondent corporation and the government provides for the strictest supervision by the atomic energy commission of work done, acts performed, and services rendered by the corporation in its performance of obligations required of it under the contract. In connection with this aspect of the matter, certain findings of the trial court seem most significant. These are quoted at some length, as follows:

"V. That in the course of performance required by the Contract, the Plaintiff was required to and did expend large sums of money from funds created by advances and current reimbursements thereto from the United States of America and money collected on behalf of the United States from private persons, firms and corporations, which monies were applied to the performance of the Contract, and Plaintiff has continued to receive such reimbursements throughout the entire period of performance.

"The Plaintiff Contractor was not and is never required to utilize its own funds. The tax collected by the State has been measured by the total amount of reimbursements for labor and materials, that is, the cash paid into Plaintiff's account by the United States, the funds received by the Plaintiff from third parties and deposited in the account, and credits received through payroll deductions. From the fund so created the Plaintiff pays the salaries of its employees, the cost of materials procured for the work and any and all other expenses incurred under the Contract.

"VI. That from the date of the Plaintiff's entry upon the performance of the Contract, and continuously since, the Tax Commission of the State of Washington has held that the amounts received by Plaintiff (as hereinbefore set forth), are includable in its gross income for the purpose of computing the measure of the tax payable under the provisions of Title II of the Revenue Act of 1935, as amended, entitled Business and Occupation Tax, being Section 8370-4 to and including Section 8370-15 of Remington's Revised Statutes

of Washington, as amended to date, and has demanded of Plaintiff payment in full of the tax so levied.

"...

"VIII. That under its Contract the Plaintiff was obligated to:

"1. Manage and operate all the fissionable material production facilities of the project.

"2. Manage and operate the Village of Richland and the construction camp community at North Richland, providing all necessary municipal facilities and services at Government expense and serving as agent for the Government for all real estate which comprises the communities.

"3. Construct or provide for the construction of all plants and facilities needed for manufacturing processes and facilities related thereto and construct or provide for the construction of residential communities and other facilities necessary for the functioning of the communities.

"4. Provide all architect-engineer services in connection with the foregoing.

"5. Conduct development and research relative to production of fissionable materials.

"IX. That under the terms, covenants and conditions of said Contract the Plaintiff is to be reimbursed for all costs of whatever nature incurred under the Contract, and to receive as its sole payment at the completion of the Contract a fixed fee of ONE DOLLAR ($1.00).

"X. That by virtue of the terms of the Atomic Energy Act of 1946, as amended, and the Contract, all property and equipment utilized by the Plaintiff in the production and construction contemplated under the Contract, title to all drawings, designs and specifications created under the Contract and complete control over the product, and all its component parts, while in process and after manufacture, vests in the Atomic Energy Commission, and patents to all processes and designs conceived or developed under the Contract are owned by the Atomic Energy Commission or are assignable to it, if the Atomic Energy Commission desires.

"XI. That the Plaintiff prepares preliminary studies, final designs, costs estimates, supervises all construction work, makes appropriate field tests, submits progress reports, and performs all other architectural and engineering services required by the Contract, either subject to the approval or at the direction of the Atomic Energy Commission.

"XII. That the Atomic Energy Commission reserves the right to furnish any or all of the materials and equipment in accordance with the Contract.

"XIII. That the Plaintiff must obtain the prior approval or ratification of the Atomic Energy Commission for all purchases or contracts over FIVE THOUSAND DOLLARS ($5,000.00), (and in the case of construction over TWO THOUSAND DOLLARS ($2,000.00)).

"XIV. 1. That the Plaintiff is required to get approval of the Atomic Energy Commission before purchasing or utilizing materials, supplies, and equipment of its own manufacture, when the price is TWO HUNDRED FIFTY DOLLARS ($250.00), or over.

"2. That the Hanford Operations Office of the Atomic Energy Commission at all times maintains constant supervision of the Plaintiff's actions in the performance of the Contract.

"3. That the Plaintiff is subject to the administrative and technical procedures prescribed by the Atomic Energy Commission in the construction, operation and research phases of the Contract.

"4. That the Atomic Energy Commission has the right to pay directly to third parties all sums due for labor, material and other charges arising from the Contract.

"5. That all construction subcontracts are subject to the approval of the Atomic Energy Commission.

"6. That all subcontracts for the operation, research development, and production processes require the prior approval or ratification of the Atomic Energy Commission.

"7. That production schedules are prescribed by the Atomic Energy Commission.

"8. That all work and services of the Plaintiff under the terms of the Contract are subject in all respects to the approval of the Atomic Energy Commission.

"XV. That the area known as the Hanford Works, which is the situs of the Plaintiff's operation and performance of the Contract, was obtained by the Government for the sole purpose of constructing and operating the Government's atomic energy plant. Certain basic requirements make the area geographically desirable. The Government acquired by purchase or condemnation all of the land, something in excess of 400,000 acres, on which the communities and plants were built. Although the Government did not take exclusive jurisdiction of the area, all unauthorized persons are excluded from the area, with the exception of the village of Richland and the community of North Richland. All ingress and egress of people is controlled and only permitted to those with official business who have obtained security clearance in accordance with the requirements of Section 10 of the

Atomic Energy Act. In addition to the controls on the ground that have been established by Public Proclamations 18 and 28, dated July 14, 1943, and November 12, 1946, respectively, issued by the Commanding Officer, Western Defense Command and by Headquarters, Sixth Army, respectively, the President of the United States on January 17, 1948, by Executive Order No. 9925 established air space reservation over the Hanford Works at Richland, Washington. Thus, complete control by the Government over the area is exercised. Practically all of the buildings on the land comprising the area known as the Hanford Works, including the village of Richland, were either built for, have been purchased by, or belong to the Government.

"XVI. That Plaintiff performs all the municipal activities for the area included within the Hanford Works, particularly for the community of Richland. It constructs roads necessary for the prosecution of the work and maintains these roads. Further, the General Electric Company, at the direction of the Government, has provided school facilities, police and fire protection, sewage, lighting, town bus system, dormitories, and a hospital, all of which are Government-owned. The Plaintiff manages and maintains housing facilities in the Hanford Works area and grants licenses and leases to persons, firms and corporations for the operation of businesses and commercial enterprises for the benefit of personnel located on or connected with the project. The General Electric Company collects the revenue from such license and lease arrangements for and on behalf of the Government. Under its Contract, the General Electric Company provides these services and executes the necessary contracts for housing, licenses, leases and concessionaire agreements as agent of the Government. The Plaintiff has so acted at all times in its management of the Government properties and received reimbursements therefor, which are asserted by the Defendant to be taxable under the Washington State Business and Occupation Tax (Rule 223, Rules Relating to the Revenue Act). The General Electric Company owns none of the real or personal property which it operates and manages in the performance of its Contract.
"    .    .    .

"XX. That the Contract is to be performed entirely at the expense of the Government and the contractor is not to be liable for and the Government shall indemnify and hold the contractor harmless against any delay, failure, loss, expense (including the expense of litigation) or damage (including personal injuries and deaths of persons and damage to prop-

erty) of any kind and for any cause whatsoever arising out of or connected with the work and whether or not any employee or employees of the contractor is responsible therefor, unless such delay, failure, loss, expense or damage has been established by the Government to have been caused directly by bad faith or wilful misconduct on the part of certain named corporate officers of the contractor within the scope of his or their authority and employment. This provision, which is an extraordinary provision in Government contracts, was approved by the President of the United States as it originally appeared in the contract between the du Pont Company and the Manhattan Engineer District. Further, it is provided that the Government shall assume and carry on the defense of all claims, suits or legal proceedings which might be asserted against the contractor on account of acts or omissions in the performance of the work, and that the Government shall pay directly and discharge completely all final judgments entered against the contractor in such litigation or claims which are settled by agreement approved by the contracting officer.

"XXI. That salaries and expenses of the company's employees are paid by the Government. These salaries are subject to the approval of the contracting officer. When, in the opinion of the contracting officer, the Plaintiff's personnel or overhead is excessive for the proper performance of the Contract, reductions are to be made as required by the contracting officer, subject to the right of appeal by the contractor pursuant to the 'Disputes' article of the Contract.

"XXII. That the contractor is required to dismiss employees deemed by the Government to be incompetent, careless, insubordinate, or whose continued employment is deemed to be inimical to the public interest.

". . .

"XXIV. That under the Contract the General Electric Company provides the personnel and certain technical experience and the Government provides the facilities, money, and upon consultation with the contractor, formulates the policies and programs to be carried out, subject to the controls under the program by the Executive and Legislative Branches of the Government as set forth in the Atomic Energy Act. The actual plant operations are carried on by the employees of the Plaintiff under the general supervision of the Government, and subject to and in accordance with policies and instructions from the Government. At all times there is a very close coordination between the General Electric Company and the Government."

The business and occupation tax has been imposed and collected by the state of Washington under the applicable provisions of the revenue act of 1935. The Washington state tax commission periodically has measured the tax to be paid on the basis of the total annual sums paid by the United States government to the corporation. Such sums cover costs of labor, material, supplies, and services employed or used by the corporation in connection with its operations under the terms of the contract with the government. The state contends, among other things, that the tax or its incidence falls upon the corporation rather than upon the United States government; that the United States government, the atomic energy commission, or the activities thereof, are not taxed. In support of this contention, the state relies upon Rem. Rev. Stat. (Sup.), § 8370-14, which reads as follows:

"Purpose of title. It is not the purpose of this title that the taxes herein levied upon persons engaging in business shall be construed as taxes upon the purchasers or customers, but it is the intention that such taxes shall be levied upon, and collectible from, the person engaging in the business activities herein designated and that such taxes shall constitute a part of the operating overhead of such persons engaging in business."

Confronted with the opinion of the United States supreme court in *Carson v. Roane-Anderson Co.*, *supra*, the technical distinction urged by the state, and the argument or legal conclusion based thereon, appear to me to be of no consequence, whatsoever, in the instant case. If the United States Congress has the power to immunize respondent corporation from state taxation; if the performance by respondent of its contract with the United States government constitutes "activities" of the atomic energy commission, as the term "activities" is used in § 9 (b); or, if the decision of the United States supreme court in *Carson v. Roane-Anderson Co.*, *supra*, establishes an immunity from state taxation under § 9 (b) sufficiently broad to encompass respondent's activities in the state of Washington;

then, most certainly, the above-mentioned contentions of the state are of no avail.

It may be of some interest to note that the opinion was rendered in the *Carson* case after the superior court for Thurston county rendered its decision in the instant case. Furthermore, after the opinion of the United States supreme court was rendered in the *Carson* case, knowledge of its implications as to state tax revenues was received with much apprehension by various chief state executives and other state officials. This is evidenced by the government's printed report entitled, "Hearing before the Joint Committee on Atomic Energy Congress of the United States on State Taxation of Atomic Energy Commission Contractors," dated April 24, 1952. Contained in the report is a letter from Governor Arthur B. Langlie, of the state of Washington, addressed to members of the joint committee on atomic energy of the Congress. It reads, in part, as follows (p. 38):

"Dear Senator: I feel it my urgent duty as Governor of the State of Washington to bring to your attention the possible consequences of the decision handed down by the Supreme Court of the United States on January 7, 1952, in the cases of *Carson v. Roane-Anderson Co.* and *Carson v. Carbide & Carbon Corp.* and to request you, as a member of the Joint Congressional Committee on Atomic Energy, to lend your every effort in obtaining the necessary congressional action correcting or clarifying section 9(b) of the Atomic Act of 1946.

". . . The matter for greatest concern is the fact that the Court accepted the Government's proposition that Congress, by the use of the word 'activities' in said section 9(b), intended to grant a tax exemption to private independent contractors. *Under this decision there seems little escape from the conclusion that private independent contractors with the Atomic Energy Commission may now be completely immune from all State and local taxation.*

"While the Roane-Anderson case deals with sales and use taxes, *yet there is no limitation of the exemption indicated in the opinion.* If 'activities' refers to contractors' activities, then by literal application of the statute, these contractors 'are hereby expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision thereof.' Real and personal property taxes, income

taxes, unemployment compensation and other payroll taxes, business and occupation taxes and other franchises, and all similar levies would thus be included within the scope of the exemption. Some apprehension has been further voiced that the decision might be equally applicable to sub-contractors, sub-subcontractors, and even those who merely sell merchandise to those involved in the performance of contracts.

". . . If the Roane-Anderson Co. decision is held to be controlling the State will be required to refund approximately $1¼ million and should the doctrine of that case be extended to subcontractors the State's tax problem would be multiplied many times over. There is the even more serious possibility that the right of the State to collect various payroll taxes will be imperiled. . . .

"In my view, the interpretation of the Court is a most serious interference with State and local tax powers. If this principle is extended to apply to other types of Federal contractors, it means that a substantial part of the State and local tax base has been swept out of existence. Fundamentally, the principle of concurrent powers of taxation in the Federal and State governments is implicitly denied by the Court's interpretation. . . ." (Italics mine.)

Much in the same vein is a letter from Governor Adlai E. Stevenson, of the state of Illinois, which appears in the same report at p. 1, and in part, reads as follows:

"On January 7 last, the United States Supreme Court held, in the cases of *Carson v. Roane-Anderson Company* and *Carson v. Carbide and Carbon Corporation,* that the word 'activities' in section 9(b) of the Atomic Energy Act of 1946 covered private persons and corporations doing work for the Atomic Energy Commission on an independent contractural basis in such manner that the sales and use taxes of the State of Tennessee could not be applied in those cases. The issue of constitutional power was not involved in the cases and the Court merely held that the Congress, in the section quoted, intended to extend tax immunity to these contractors.

"Because of the magnitude of the operations of the Atomic Energy Commission, and also because of the thrust of the Supreme Court's holding would not appear to be necessarily confined merely to sales and use taxes, the States generally have been quite alarmed by this decision. Their researches suggest that perhaps Congress really did not intend to create any such immunity, and this squares with

previous efforts on the part of Congress to resist efforts to extend the tax immunity of the Federal Government to its contractors. You will recall that, throughout the last war, it was the Federal policy not to allow contractors with the Federal Government to share its immunity from State taxes.

"Those States which happened to have representatives on the Joint Committee on Atomic Energy have been asked to assist in seeking clarification of congressional policy on this matter and, if it meets with the true congressional intent, to suggest an amendment of the law which will accurately reflect that intent. One way to do this, of course, would be to strike from section 9(b) the word 'activities' which, it can be readily seen, is a word of confusing breadth and which may not be a happy choice to convey the true desires of Congress in this regard. I am sure that all of the States, including Illinois, will greatly appreciate your active consideration of this problem."

In the *Carson* case, commenting on the Tennessee tax statutes there involved, the United States supreme court said (p. 233):

"The Retailers' Sales Tax Act of Tennessee, Tenn. Acts 1947, c. 3, imposes a sales tax on the sale of goods in Tennessee and a use tax on the use within the state of goods purchased elsewhere. Tennessee collected these taxes from respondents who paid them under protest and then brought these suits to recover them and to enjoin future collections. Two of the respondents are private companies who are contractors for the Atomic Energy Commission and who paid use taxes; two are merchants who paid sales taxes on sales to those contractors and who passed the taxes on to them. The use taxes and the sales taxes were on articles used by the contractors in the performance of their contracts with the Commission."

At this point we note that the Tennessee supreme court held (*Roane-Anderson Co. v. Carson,* 192 Tenn. 150, 239 S. W. (2d) 27), that the particular taxes of that state were not prohibited by the United States constitution, *but were forbidden by § 9(b) of the atomic energy act.*

As to the power of Congress to provide an immunity from state taxation, in *Carson v. Roane-Anderson Co., supra,* the United States supreme court said (p. 233):

"The constitutional power of Congress to protect any of its agencies from state taxation . . . has long been

recognized as applying to those with whom it has made authorized contracts. See *Thomson v. Pacific R. Co.*, 9 Wall. 579, 588-589; *James v. Dravo Contracting Co.*, 302 U. S. 134, 160-161."

The United States supreme court further said (p. 234):

"*Certainly the policy behind the power of Congress to create tax immunities does not turn on the nature of the agency doing the work of the Government. The power stems from the power to preserve and protect functions validly authorized (Pittman v. Home Owners' Corp., supra, p. 33)— the power to make all laws necessary and proper for carrying into execution the powers vested in the Congress.* U. S. Const., Art. I, § 8, cl. 18. Hence if the present contracts which the respondent contractors have with the United States, and the performance thereunder, are 'activities' within the meaning of § 9(b) of the Act, the immunity is clear. Our view is that they are and that the judgments below must be affirmed." (Italics mine.)

Referring to the legislative history of the atomic energy act, the United States supreme court continued (p. 234):

"The question whether the Commission should be empowered to employ private contractors in performance of its functions or whether the Commission should itself be the entrepreneur was an issue of national policy much discussed and debated at the time the legislation was before the Congress."

It is pointed out in the opinion that Congress determined it would be our national policy to permit the atomic energy commission to contract with and to use private contractors and their know-how to assist the commission in the conduct of its affairs. The court, referring to the commission, said (p. 235):

"Its activities may, in other words, be performed by it directly or through the agencies of private enterprise."

As to the interpretation and application of the term "activities," used in § 9(b), the court said (p. 235):

"Congress uses the word 'activities' in various sections of the Act, and seems each time to give it a broad sweep. The Congressional or Joint Committee constituted under § 15 is directed to study 'the activities' of the Commission. The reports which the Commission is directed to submit to Con-

gress pursuant to § 17 concern its 'activities.' Section 9(b) authorizes the Commission to make payments to state and local governments in lieu of property taxes in those areas 'in which the activities of the Commission are carried on and in which the Commission has acquired property' previously subject to local taxation. *In none of these sections do we find any suggestion that 'activities' is used in a narrow sense to describe less than all of the functions of the Commission. The meaning of 'activities' as applied either to an individual or to a government agency may be broad enough to include what is done through independent contractors as well as through agents.* Certainly where the pattern of conduct visualized by the Act is the use of independent contractors or agents from the field of private enterprise, *the inference is strong that 'activities' means all authorized methods of performing the governmental function. We find no contrary evidence from the legislative history.*" (Italics mine.)

I am convinced that in the *Carson* case the United States supreme court has laid down a policy of immunity from state taxation with a broad brush. Ours is a government of dual sovereignty—state and Federal. In the very nature of things, we are bound by and must follow the decisions of the United States supreme court under the supremacy clause of the United States constitution. The *Carson* case is controlling. It constitutes a compelling precedent and decides the basic questions raised in the instant case in a manner contrary to the contentions of the state of Washington. In this connection, it is suggested that the authoritative interpretation of the Federal statute (§ 9(b) of the atomic energy act) by the United States supreme court calls into effect subsection (f) of Rem. Rev. Stat. (Sup.), § 8370-12 (our business and occupation tax statute), which reads:

"In computing tax there may be deducted from the measure of tax the following items:  . . .

"(f) Amounts derived from business which the State of Washington is prohibited from taxing under the constitution of this state or the constitution or laws of the United States."

There is one further point in this case. The tax immunity is established by § 9(b) as of the effective date of the atomic energy act. Business transacted in this state by respondent corporation under its contract with the Federal government

*prior* to the effective date of the act, would be subject to the business and occupation tax of the state of Washington, under the decision in *Silas Mason Co. v. Tax Commission, supra.* With the exception of whatever difference this may make in the amount of the tax to be refunded, I think the judgment of the trial court should be affirmed.

SCHWELLENBACH, J., concurs with FINLEY, J.

DONWORTH, J. (dissenting)—I am in accord with the views expressed in Judge Finley's dissenting opinion, but I wish to emphasize his reference to the supremacy clause of the United States constitution because, in my opinion, we are bound by the interpretation which the United States supreme court placed upon the word "activities" in § 9 (b) of the atomic energy act of 1946, in *Carson v. Roane-Anderson Co.*, 342 U. S. 232, 96 L. Ed. 257, 72 S. Ct. 257. To my mind, this constitutional provision is the key to the solution of the problem presented in this case.

The contract between respondent and the atomic energy commission (described in the findings of the trial court) makes it very evident that respondent is merely spending money belonging to the United States in the manner directed by the commission. Respondent's actions pursuant to the contract are not its own but are in fact, as well as in law, activities of the commission. The relationship created by the contract differs materially from that which existed between the government and the contractor in *Silas Mason Co. v. Tax Commission*, 302 U. S. 186, 82 L. Ed. 187, 58 S. Ct. 233, where the latter undertook to construct a certain dam and power house for a lump sum. In so doing, the contractor expended its own funds and presumably realized a profit. Here respondent's actions are directly controlled by the commission in the minutest detail, and the only monetary compensation received by respondent for acting as the commission's agent is the sum of one dollar.

Article VI of the United States constitution contains the supremacy clause, which reads:

"This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties

made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; *and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.*" (Italics mine.)

This provision means that, as a judge of this court, I am bound by the interpretation which the supreme court of the United States has placed upon the act of Congress involved in the case at bar. This statute in § 9(b) provides that ". . . the activities . . . of the commission are hereby expressly exempted from taxation in any manner or form by any state. . . ."

The supreme court, which is the final authority on the meaning of acts of Congress, has given the term "activities" a broad interpretation and this is binding upon all state courts. Federal statutes must be uniformly construed throughout the United States both in Federal and state courts.

Therefore, under the supremacy clause, the decision in the *Carson* case, *supra*, holding that the term "activities" in the atomic energy act means "all authorized methods of performing the governmental functions" compels an affirmance of the trial court's judgment.

The only remedy available to appellant is to seek redress from the Congress.

---

May 18, 1953. Petition for rehearing denied.