IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 2000 Session

## J. C. BRADFORD & COMPANY v. SOUTHERN REALTY PARTNERS, a Tennessee general partnership, and WESTON MANAGEMENT COMPANY

**Direct Appeal from the Chancery Court for Shelby County**
**No. 107359-3;     The Honorable D. J. Alissandratos, Chancellor**

————————

**No. W1999-01617-COA-R3-CV - Filed August 14, 2000**

————————

This cause came to be considered by the Court upon a claim for misrepresentation arising from a real estate transaction. This is the second occasion that the Court has had to address this case. Initially, this cause was set for trial, and following opening statements, the Chancellor ruled from the bench in the defendants' favor. On appeal, this Court remanded the cause to the trial court for further proceedings consistent with the opinion. On remand, the defendants filed a motion for summary judgment, renewed a previously filed motion to dismiss and filed a counterclaim for attorneys fees. The trial court granted the defendants the requested relief. This appeal followed. Upon consideration of the record, the Court finds that the trial court's orders granting summary judgment, dismissing the complaint and awarding attorneys' fees should be vacated and that the cause should be remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which CRAWFORD, P.J., and LILLARD, J., joined.

Carl H. Langschmidt, Jr., Bobby Leatherman, Memphis, for Appellant

J. Alan Hanover, James R. Newsom, III, Memphis, for Appellee, Southern Realty Partners; Martin W. Brown, Memphis, for Appellee, Weston Management Company

**OPINION**

This is the second occasion that this Court has had to address this case involving allegations of fraudulent and negligent misrepresentation and violation of the Tennessee Consumer Protection Act. The Court originally addressed this case in *J.C. Bradford & Co. v. Southern Realty Partners, et al.*, No. 02A01-9801-CH-00006 (Tenn. Ct. App. Dec. 10, 1998). The plaintiff, J.C. Bradford & Company (hereinafter, "Bradford") had appealed to this Court from the trial court's decree dismissing its complaint and awarding a judgment on the counterclaims of the defendants, Southern

Realty Partners (hereinafter, "Southern") and Weston Management Company (hereinafter, "Weston"). In the interest of judicial economy, the Court will incorporate relevant portions of our previous opinion in this opinion.

In late 1993, Bradford began negotiations with Weston, who was acting as agent for Southern, to lease a building in Memphis. The agreement in final form required Southern to build an office building to fit Bradford's needs in exchange for a ten (10) year lease. During the lease negotiations, Bradford agreed to an "expense stop" of $4.35 per square foot, and this is the subject of the dispute between the parties.

An "expense stop" is the maximum amount of the operating expenses that the landlord agrees to pay. (Footnote omitted). In this case, the initial proposal required Southern to pay all operating expenses up to $4.50 per square foot. Bradford also wanted to cap the "expense stop" at a five (5%) percent increase after the first year. After lengthy negotiations, Weston would not agree to the cap on taxes, insurance, and utilities because it had no control over an increase in these costs. However, Weston did agree to a reduction in their management fee and base rent in exchange for reducing the "expense stop" to $4.35. This final proposal was accepted by Bradford, and according to the lease, if the operating expenses exceeded the "expense stop" Bradford would be required to pay the excess.

This dispute arises out of the negotiations concerning the "expense stop." Southern purchased the land upon which the office building in question is located to use as a speculative investment. It hired Weston as its agent to find a business to lease the land. In late 1993, David Peck (Peck), Weston President and CEO, contacted Bradford's Memphis area manager for the purpose of negotiating a build-to-suit office building on the land owned by Southern. After Bradford explained to Peck that it was interested in a one-story, residential style office building, Peck attempted to determine an estimate of the operating expenses for the completed project. He obtained information on the operating expenses of twelve other East Memphis office complexes, and attempted to adapt those numbers to the type of building that Bradford had requested. At that time, neither Bradford nor Weston knew the size nor specifications of the yet unplanned building.

Based upon his examination of operating expenses of the twelve buildings, Peck sent a written proposal to Bradford's Memphis area manager on January 6, 1994. The proposal stated, "[m]y best estimate for the operating expenses for the first twelve (12) months of occupancy will be $4.50 per square foot." (Footnote omitted). Both parties negotiated the terms of the lease, culminating in a final lease signed on March 28, 1994 that had both a lower base rent and an "expense stop" of $4.35. (Footnote omitted). Construction of the office building began on May 16, 1994, and the project was completed and Bradford moved in by December 1, 1994.

The first year operating expenses turned out to be $7.05 per square foot. (Footnote omitted). Because the operating expenses exceeded the "expense stop" by $2.70, Bradford owed Southern an extra $45,900 on the first year lease, and an estimated $500,000 over the entire term of the lease. (Footnote omitted).

After Weston sent it an invoice for the operating expenses exceeding the "expense stop," Bradford refused to pay and filed suit against Southern alleging fraud and negligent misrepresentation on the part of Peck, as an agent of Southern. Bradford claimed that Peck knew or should have known that operating expenses would be much higher than his estimation of the "expense stop." Initially, Bradford sought reformation of the lease by modifying the "expense stop" to a number much closer to actual expenses, and sought damages, and injunctive relief. The complaint also requested that Bradford be allowed to deposit the additional rent that was allegedly due under the lease into the court until the resolution of all disputes. The Chancellor granted Bradford's request that it be allowed to continue to occupy the building and permitted it to pay the additional rent into the court clerk's office. However, the trial court granted summary judgment on Bradford's prayer for reformation. (Footnote omitted). Bradford was allowed to amend the complaint to add a claim under the Tennessee Consumer Protection Act (TCPA). Bradford continued, and is presently, occupying the office building and paying the base rent to Southern.

Southern answered Bradford's amended complaint and specifically denied that its agent, Weston, made any misrepresentations concerning the "expense stop" and further claimed that Bradford did not justifiably rely on Peck's statements concerning the estimate of operating expenses. Southern also filed a counterclaim against Bradford alleging that it had defaulted by refusing and/or failing to pay the additional rent due under the lease. The counterclaim requested the court to award it the additional rent, interest, late fees, and attorneys' fees. Following Southern's counterclaim, Bradford joined Weston as a party to this lawsuit on November 15, 1996.

The parties appeared for trial without a jury on September 22, 1997. At the conclusion of rather extensive and somewhat convoluted opening statements, the Chancellor ruled from the bench that Bradford's complaint be dismissed, that Weston's counter-complaint for attorney fees in its own right be dismissed, and that judgment be awarded to Southern on its counter-complaint. Subsequently, after a hearing to determine the amount of Southern's attorney fees, the Chancellor entered a final decree in accordance with his prior ruling.

*J.C. Bradford & Co. v. Southern Realty Partners, et al.*, No. 02A01-9801-CH-00006 (Tenn. Ct. App. Dec. 10, 1998).

Upon consideration of Bradford's appeal, the Court concluded that a trial court cannot order the involuntary dismissal of an action at trial upon the sole basis of the opening statements of

counsel. Accordingly, the Court vacated the trial court's judgment and remanded the case for further proceedings as necessary.

On remand, both Southern and Weston filed motions on January 25, 1999, seeking summary judgment as to all of Bradford's claims and seeking judgment against Bradford as to Southern's counterclaim. Southern also renewed its previously-filed motion to dismiss the same date, and Weston later joined in the motion. Bradford subsequently filed a motion to recuse or, in the alternative, for a jury trial, which the trial court denied on February 23, 1999. Ultimately by order entered March 18, 1999, the trial court granted the defendants' renewed motion to dismiss and the defendants' motion for summary judgment. In addition to dismissing Bradford's claims, the order also adjudged Southern's attorneys' fees and costs against Bradford as provided for in the lease. The order reserved the amount of the award for later determination. In addition, the order reserved for later adjudication the defendants' entitlement to an award of attorneys' fees pursuant to the Tennessee Consumer Protection Act, T.C.A. § 47-18-101 *et seq.*

On March 31, 1999, Southern filed a motion for attorneys' fees and costs pursuant to the lease and the Tennessee Consumer Protection Act, and Bradford filed a response on April 9, 1999. On April 12, 1999, Weston also filed its own motion for attorneys' fees and costs, to which Bradford promptly filed a response. Ultimately on May 4, 1999, the trial court entered its "Final Decree" in which it, *inter alia*, reiterated its earlier rulings dismissing the complaint and awarding summary judgment in favor of the defendants. That order also awarded attorneys' fees of $177,691 to Southern's counsel, Hanover, Walsh, Jalenak & Blair, PLLC, and the sum of $20,842.50 to Southern's counsel, Martin W. Brown. The final decree also awarded $75,672 in attorneys fees to Brown for his services as Weston's counsel. In addition, the final decree awarded costs to the defendants. Following entry of the final decree, Bradford timely filed its notice of appeal on May 28, 1999.

The parties have raised the following issues for appellate review:

I. Whether the Chancellor properly granted the defendants' motion for summary judgment as a matter of law;

II. Whether the Chancellor properly awarded attorneys' fees to Southern under the terms of the lease with Bradford;

III. Whether the Chancellor properly awarded attorneys' fees to Southern and Weston under the provisions of the Tennessee Consumer Protection Act;

IV. Whether the amounts of the attorneys' fees awarded were proper; and

V. Whether the Chancellor erred in not recusing himself.

Our role on an appeal from a summary judgment is to determine whether the requirements of Rule 56 Tenn.R.Civ.P. have been met. *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741,

744 (Tenn. 1991); ***Mansfield v. Colonial Freight Sys.***, 862 S.W.2d 527, 530 (Tenn. App. 1993). We begin our analysis of the issue of summary judgment by noting that a trial court should grant a motion for summary judgment only if the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56.03 Tenn.R.Civ.P.; ***Byrd v. Hall***, 847 S.W.2d 208, 210 (Tenn. 1993). The party moving for summary judgment bears the burden of demonstrating that no genuine issues of material fact exist. ***Byrd***, 847 S.W.2d at 210. In ***Byrd***, the Tennessee Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. (Citations omitted). In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

***Id.*** at 211. (Emphasis in original).

No presumption of correctness attaches to the trial court's judgment, and the task of the appellate court is confined to reviewing the record to determine whether the requirements of summary judgment have been met. ***Carvell v. Bottoms***, 900 S.W.2d 23, 26 (Tenn. 1995). All evidence must be viewed in the light most favorable to the non-movant, and all legitimate conclusions of fact must be drawn in favor of the non-movant. ***Byrd v. Hall***, 847 S.W.2d at 211.

In such a case, it is imperative that the reviewing court look to the plaintiff's complaint to ascertain what is being alleged. The complaint states in pertinent part:

> 4. ....Under the provision of the Lease set out above, the "expense stop" is $4.35, meaning that Bradford is responsible for all actual operating expenses which exceed $4.35 a foot. Thus, Southern made demand upon Bradford for the difference of $2.70 per square foot or $45,910.80....
>
> . . . . . . . . .
>
> 7. Bradford avers that Southern, by and through its agent Weston, made misrepresentations as to material facts and that Bradford reasonably relied on such representations and Bradford will suffer losses and damages as a result of same. More specifically, Southern and Weston knew or should have known that an "expense stop" of $4.35 was woefully inadequate in Memphis, Tennessee, for a first class office building of the type constructed for and leased to Bradford. As such, the actual operating expenses of the building for the first year of the Lease exceeded the "expense stop" by more than $45,000.00 and over the life of the Lease such expenses

-5-

will result in damages and losses to Bradford in an amount estimated to be at least $500,000.00.

. . . . . . . . . .

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF PRAYS:

. . . . . . . . . .

6. That the Court issue a Declaratory Judgment declaring and defining the rights of the parties, specifically finding that plaintiff was induced into signing the Lease by misrepresentations by defendant and that the proper "expense stop" under the lease should not be $4.35 per square foot but should be a figure which accurately reflects the true operating expenses pertaining the property.

In essence, Bradford asserts that the quoted $4.35 "expense stop" did not represent the defendants' true "best estimate"of first year operating expenses.  To this end, we look to the Lease agreement entered into between the parties.  The pertinent portions are as follows:

> 2.02 Operating Expenses.  In the event Lessor's operating expenses for the building of which the leased premises are a part shall, in any calendar year during the term of this Lease, exceed the sum of $4.35 per square foot, Lessee agrees to pay as additional rent such excess operating expenses.  Lessor may invoice Lessee monthly for the estimated operating expenses for each calendar year, which amount shall be adjusted each year based upon anticipated operating expenses.  Within nine months following the close of each calendar year, Lessor shall provide Lessee an accounting showing in reasonable detail all computations of additional rent due under this section.  In the event the accounting shows that the total of the monthly payments made by Lessee exceeds the amount of additional rent due by Lessee under this section, the accounting shall be accompanied by a refund.  In the event the accounting shows that the total of the monthly payments made by Lessee is less than the amount of additional rent due by Lessee under this section, the accounting shall be accompanied by an invoice for the additional rent. Notwithstanding any other provision in this Lease, during the year in which the Lease terminates, Lessor, prior to the termination date, shall have the option to invoice Lessee for the excess operating expenses based upon the previous year's operating expenses.  If this Lease shall terminate on a day other than the last day of a calendar year, the amount of any additional rent payable by Lessee applicable to the year in which such termination shall occur shall be prorated on

the ratio that the number of days from commencement to and including the termination date bears to 365. Lessee shall have the right, at its own expense and within a reasonable time, to audit Lessor's books relevant to the additional rent payable under this section. Lessee agrees to pay any additional rent due under this section within ten days following receipt of the invoice or accounting showing additional rent due. The maximum amount payable by Lessee on account of operating expenses (excluding expenditures for insurance, taxes, utilities and any other operating expenses not under the reasonable control of Lessor) for any year during the term of this Lease shall be 105% for any increases in the total operating expenses for the immediately preceding year. At all times during the term of this lease, Lessee shall pay its full share of the operating expenses attributable to taxes, insurance, utilities and any other operating expenses not under the reasonable control of Lessor.

The Lease also defines "Operating Expenses" as:

2.03 Definition of Operating Expenses. The term "operating expenses" includes all expenses incurred by Lessor with respect to the maintenance and operation of the building of which the leased premises are a part, including, but not limited to, the following: maintenance, repair and replacement costs; electricity, fuel, water, sewer, gas and other utility charges; security, window washing and janitorial services; trash and snow removal; landscaping and pest control; management fees (not to exceed 4% of gross annual rental), wages and benefits payable to employees of Lessor whose duties are directly connected with the operation and maintenance of the building; all services, supplies, repairs, replacements or other expenses for maintaining and operating the building including parking; the cost, including interest, amortized over its useful life, of any capital improvement made to the building by Lessor after the date of this Lease which is required under any governmental law or regulation that was not applicable to the building at the time it was constructed; the cost, including interest, amortized over its useful life, of installation, of any device or other equipment which improves the operating efficiency of any system within the leased premises and thereby reduces operating expenses; all other expenses which would generally be regarded as operating and maintenance expenses which would reasonably be amortized over a period not to exceed five years; all real property taxes and installments of special assessments, including dues and assessments by means of deed restrictions and/or owners' associations which accrue against the building during the term of this Lease; and all insurance premiums Lessor is required to

pay or deems necessary to pay, including public liability insurance, with respect to the building. The term operating expenses does not include the following: repairs, restoration or other work occasioned by fire, wind, the elements or other casualty; income and franchise taxes of Lessor; leasing commissions and advertising expenses; interest or principal payments on any mortgage or other indebtedness of Lessor; compensation paid to any employee of Lessor above the grade of property manager; any depreciation allowance or expense; capital expenditures; or operating expenses which are the responsibility of Lessee.

It is self-evident that the term "operating expenses" encompassed virtually every reasonably conceivable expense which might accrue in regard to the operation of the commercial building at issue. The operating expenses contemplated above were first included in the March 8, 1994, proposal presented to and accepted by Bradford. That proposal stated in relevant part:

REVISED PROPOSAL FOR J.C. BRADFORD & CO.

LOCATION: The proposed office building will be located on an approximate 1.9 acre site on the west side of Massey Road approximately one block north of the intersection of Poplar Avenue and Massey Road

FACILITY: The proposed building will be an attractive single story office structure containing a total of approximately 17,626 gross square feet and 17,004 useable square feet. Pricing and design has been predicated on preliminary plans and specifications furnished by Bradford's architectural firm (Johnson, Johnson, Crabtree) and revisions made by Weston Design, Inc. (See attached floor plan, site plan and outline specifications marked as Exhibit A & B, respectively.)

. . . . . . . . . .

REAL ESTATE        Lessee will be responsible for all
TAXES &            operating expense increases (excluding capital

-8-

OPERATING
EXPENSES: expenditures) based on an "expense stop" of $4.35 PSF for the entire lease term. This is the best estimate of the building's total operating expenses during the first twelve (12) month period of occupancy. Normal utility charges are included in the rental rate based upon normal hours of operation from 7:00 AM to 5:30 PM Monday through Friday and 7:00 AM to 1:00 PM Saturday.

Lessor will provide five day per week janitorial service according to normal janitorial service schedules for Class A office buildings. Lessor will also assume the responsibility for maintaining the building according to the general provisions of the enclosed lease form ODS-186.

Lessor will agree to a cap of 5% per annum (non-cumulative) for the total of those expenses under its reasonable control. For example, insurance, taxes and utility charges will be excluded from the 5% cap. Management fees will be capped at 4% of the gross annual income.

. . . . . . . . . .

INTERIOR
FINISHES: The general pricing has been based on the finish schedule and floor plans previously furnished by Bradford's architectural firm (Johnson, Johnson, Crabtree) revised by Weston Design, Inc. (See floor plan, site plan and outline specifications attached to the original of this proposal as Exhibit A & B, respectively).

GENERAL This quotation for lease is predicated

PRICING on preliminary plans, finish schedule and design criteria furnished by J.C. Bradford's architectural firm (Johnson, Johnson, Crabtree) and revisions made thereto by Weston Design, Inc. This is a turnkey quotation that includes all land, building, architectural and engineering fees (excluding interior floor plans to be furnished by Bradford's architectural firm), interim interest, landscaping and irrigation system, legal and closing fees, soil studies, surveys, Phase I environmental study, site development and loan fees.

. . . . . . . . . .

SUMMARY: It should be expressly understood that this proposal is predicated on the current design criteria, finish schedule and floor plans previously furnished by Bradford as well as the execution of a mutually satisfactory lease agreement using Weston's standard lease form with approved deviations therefrom. The proposal is also subject to the receipt and approval of Bradford's current financial information. In this regard, we remain totally receptive to changes and will respond accordingly....

It appears to the Court that the crux of the lawsuit is whether David Peck's quotation of $4.35 contained in the March 8, 1994, proposal was truly the "best estimate" of projected operating expenses for the proposed building for its first year of operation. Whether actual operating expenses proved to be significantly more than that projected, whether the difference between actual and projected costs was comprised of increased taxes and utilities, whether the 5% cap applied to the estimate and whether Bradford is ultimately liable for the increased expenses are not issues that are before this Court at this time. Simply stated, at this stage of the proceedings, the case turns on a determination of whether $4.35 was truly the "best estimate" of operating costs which the defendants could have provided to Bradford. For the reasons that follow, we conclude that there is, at the least, a genuine question of material fact which precludes summary judgment.

-10-

The appellants cite this Court's opinion in ***Annaco, Inc. v. Corbin***, No. 02A01-9804-CH-00111 (Tenn. Ct. App. Dec. 31, 1998), *perm. app. denied* (Tenn. May 10, 1999), which sets forth the elements that one must prove to sustain a claim for misrepresentation. The Court stated:

> In an action for fraudulent misrepresentation, a plaintiff must show: (1) that the defendant made a representation of an existing or past fact; (2) that the representation was false; (3) that the representation related to a material fact; (4) that the representation was made either knowingly, recklessly, or without belief in its truth; (5) that the plaintiff acted reasonably in relying on the representation; and (6) that the plaintiff suffered damage as a result of the misrepresentation. ***Metropolitan Gov't. v. McKinney***, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1993).

In our analysis, the Court will address the foregoing elements.

### 1. Did the defendants make a representation of an existing or past fact?

The defendants assert that Peck's March 8, 1994, proposal setting forth operating costs of $4.35 per square foot was merely an opinion or an estimate and can in no way be construed as a representation of a past or existing fact. We respectfully disagree. The Court is well aware of the fact that the $4.35 expense stop was an estimate of the first year's operating expenses, and the Court is aware of the fact that the 5% expense cap did not apply to taxes, utilities and insurance premiums as those were items over which the parties had no control. Moreover, we agree with the appellees that the mere fact that actual operating expenses proved to be more than $4.35 is not, *per se*, actionable. In fact the probability that actual expenses would exceed the expense stop is implicit, if not explicitly stated, in the terms of the proposal and resulting Lease.

We, however, are not concerned about whether the $4.35 estimate proved to be correct at the end of the first year of operation. In fact, the Lease anticipates that it will not be correct and that the Lessee will pay overages. What we are concerned with is whether the $4.35 estimate was truly the "best estimate" that the defendants could propose in March 1994. That estimate is based upon calculations taken from historical data and is, in our opinion, an existing fact as of the time the estimate is made - regardless of whether it proves to be true in the future. Moreover, the March 8, 1994, proposal stated that it included such items as land, building, architectural and engineering fees, interim interest, landscaping and irrigation systems, legal and closing fees, as well as soil studies, surveys and the like. Given the breadth of the analysis and the access to the building's plans, it can hardly be said that the estimate was a mere shot in the dark. Moreover, the Court finds the appellees' suggestion that the estimate was a mere matter of opinion is somewhat disingenuous in light of the fact that they have sought to use the "best estimate" as both sword and shield. It is undeniable that the $4.35 estimate is incorporated into the very terms of the lease contract and is, itself, the very basis used for the calculation of damages, annual increases in operating expenses, and application of the expense cap.

**2. Was the representation false?**
**3. Did the representation relate to a material fact?**
**4. Was the representation was made either knowingly, recklessly, or without belief in its truth?**

Under the rationale of ***Byrd***, 847 S.W.2d at 211, a fact is material if it "must be decided in order to resolve the substantive claim or defense at which the motion is directed." See also, ***Hembree v. State***, 925 S.W.2d 513 (Tenn. 1996). Under the foregoing definition, it is without question that the representation of $4.35 as the "best estimate" is a material fact in this controversy. Both the proposal and the Lease contained that figure, and the defendants assert that damages are to be calculated based on an expense stop of that amount. This Court cannot, at this stage of the proceedings, determine whether the representation was false and whether it was made "either knowingly, recklessly, or without belief in its truth." Nonetheless, we can conclude that the foregoing are genuine questions of material fact that preclude summary judgment and mandate further inquiry.

Both the proposal presented by Peck and accepted by Bradford and the Lease contained an expense stop of $4.35, meaning that Bradford would be responsible for any accrued operating expenses during the first year of operation that exceeded the expense stop. In fact, the $4.35 expense stop was purported to be "the best estimate of the building's total operating expenses during the first twelve (12) month period of occupancy." Ultimate operating expenses during the first year of operation proved to be $7.05 per square foot, meaning that Bradford is potentially liable for additional operating expenses of $2.70 per square foot. The defendants assert that the overages "consist of additional taxes and utility charges in excess of [Peck's] estimate." That may well prove to be the case.

The record, however, suggests that the estimate of operating expenses may have exceeded the amount quoted. Peck analyzed the historical data on twelve buildings in the same market in arriving at his estimate. In response to interrogatories proffered by Bradford, Weston admitted that the average "Operating Expenses" for the twelve buildings used in its calculation for 1992 was $5.27 per square foot and in 1993 was $6.31 per square foot. Moreover, in Weston's calculation summary submitted to establish its estimate of the $4.35 in operating expenses, Weston allotted $1.00 per square foot in annual utility expenses, when in fact, utility expenses for the twelve allegedly comparable buildings averaged $1.61 in 1992 and $1.72 in 1993. Weston even admitted that for the five years prior to 1994, it had not owned, leased, managed or operated any office building where utility expenses were $1.00 per square foot or less. The record further contains the handwritten notes of Al Andrews, a Southern partner, taken at a February 9, 1994, meeting. In his deposition, Andrews testified, in explaining his notes, that the defendants had estimated operating expenses to be $5.25, and the notes also contained an instruction to cut the operating expenses to $4.50. It is apparent that the $4.50 figure was later reduced by $0.15 to $4.35. However, in light of the foregoing, the Court is forced to conclude that there is a dispute as to whether $4.35 was truly the "best estimate" of the first year's operating expenses, a material fact, so as to preclude summary judgment. Therefore, it is imperative that the finder of fact delve into the method and manner in which the defendants arrived at $4.35 as their best estimate.

**(5) Did the plaintiff act reasonably in relying on the representation:**

In relying upon *Annaco*, the appellees attack the fifth element, namely the reasonableness of Bradford's reliance on the representation regarding operating expenses. Generally, the reasonableness of one's reliance on an alleged misrepresentation is a question of fact not appropriate for summary judgment, so long as it can be shown that the reliance was reasonable. *Id.* Factors relevant to the determination of the reasonableness of a plaintiff's reliance on a misrepresentation include (1) the plaintiff's business expertise and sophistication; (2) the existence of longstanding business or personal relationships between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation. *Annaco, supra.* See also, *City State Bank, et al. v. Dean Winter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996), *perm. app. denied* (Tenn. April 14, 1997).

Bradford was, at all times relevant hereto, a large and sophisticated investment company with numerous branches. However, we know of no precedent that would suggest that such status is indicative of expertise in the area of real estate development. While, there is no proof of other longstanding business relationships between Southern, Weston and Bradford, that alone would not be sufficient to support a finding of no reasonable reliance. As to the third element, we agree that any enterprise seeking office space would have access to a plethora of information regarding the Memphis market. While it is true that one in possession of all material facts regarding a purchase of realty cannot recover on the basis of fraud or misrepresentation, *Winstead v. First Tenn. Bank NA,, Memphis*, 709 S.W.2d 627, 633 (Tenn. Ct. App. 1986), there has been no showing that Bradford even had access to, much less knowledge of, the relevant information used by defendants to prepare the proposal. In fact, the information used by Weston to calculate the expense appears to have been proprietary information relating specifically to twelve buildings under its management, development or lease, and as such, may not have been information generally available Bradford.

As to the elements relating to concealment of fraud and opportunity to discover the fraud, we cannot, at this time and upon this record, determine that there was fraud. What does appear from the record is that there was a fiduciary relationship between Bradford and the appellees such that the appellees were cloaked with a duty to act with honesty, candor and fair dealing. *Youngblood v. Wall*, 815 S.W.2d 512, 516 (Tenn. Ct. App. 1991). Finally, it is readily apparent that Weston solicited Bradford on Southern's behalf, and there can be no dispute regarding the specificity of the estimate; it is literally quoted to the penny.

**6. Whether the plaintiff suffered damages as a result of the misrepresentation:**

Bradford may well be responsible for some amount of overage - namely the difference between the $7.05 in actual operating expenses and the true "best estimate" of operating expenses as it existed in March 1994, when the proposal was made. However, that difference is not the "damages" in the case. "Damages" in this case, if proved, are to be based on the difference between what the true "best estimate" would have been at the time of Peck's representation and $4.35. We

stress that this Court cannot determine at this juncture whether there was even misrepresentation or even damages. Nonetheless, the potential for damages exists.

In light of the foregoing analysis, we conclude that the trial court erred in dismissing the case. Accordingly, we vacate the orders of the trial court dismissing the case and granting summary judgment in favor of the defendants. Because the trial court's orders awarding attorneys' fees and costs are predicated on the validity of the foregoing orders of dismissal, we likewise vacate those orders and remand this cause to the trial court for a hearing on the merits consistent with this Opinion. We will not rule on the issue of attorneys' fees as such would be tantamount to an advisory opinion.

As one of the issues on appeal, Bradford contends that the trial court erred in denying its motion for the court to recuse itself. As noted by the Court in **Dunlap v. Dunlap**, 996 S.W.2d 803, 813 (Tenn. Ct. App. 1998), *perm. app. denied* (Tenn. June 14, 1999), a trial court's decision regarding a motion to recuse itself is a matter of discretion. While we have determined that the trial court erred in dismissing the cause and awarding attorneys' fees and costs, we do not find that such a ruling is a demonstration of bias or prejudice so as to warrant recusal.

**Conclusion**

Upon consideration of the record, the Court finds that the trial court's orders granting summary judgment, dismissing the complaint and awarding attorneys' fees should be vacated and the case should be remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are taxed one-half to Southern Realty Partners and one-half to Weston Management Company, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE

-14-